178 P.3d 538 (2008)
George KAHO`OHANOHANO, as Next Friend of Dasia Marie Morales-Kaho`Ohanohano, a minor; Jarrett K. Kaho`Ohanohano, Individually, Plaintiffs-Appellees,
v.
DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAII, Defendant/Third-Party Plaintiff/Third-Party Counterclaim Defendant/Counterclaim Defendant/Cross-claim Plaintiff-Appellant,
Denise Morales, Defendant/Third-Party Defendant/Cross-claim Defendant/Third-Party Cross-claim Defendant-Appellee,
Darryl Ramos, Defendant/Third-Party Defendant/Cross-claim Defendant/Third-Party Cross-claim Defendant-Appellee,
John Does 1-50; Jane Does 1-50; Doe Partnerships 1-50; Doe Corporations 1-50; and Doe Governmental Entities 1-50, Defendants.
George Kaho`Ohanohano, Next Friend of Dasia Marie Morales-Kaho`Ohanohano (minor) and Jarrett Kaho`Ohanohano, Plaintiffs,
v.
Susan Drelich, M.D., Defendant/Cross-claim Plaintiff/Cross-claim Defendant,
Billie F. Strother, M.D., aka Billie Strother-Sowers, M.D., Defendant/Cross-claim Defendant/Cross-claim Plaintiff,
Amanda D. Tucker, M.D., aka Amanda D. Tuckermeuse, M.D., Defendant/Cross-claim Defendant,
Hawai`i Health Systems Corporation dba Maui Memorial Medical Center, Defendant/Cross-claim Defendant/Cross-claim Plaintiff,
Mitchell N. Tasaki, M.D.; and Mitchell N. Tasaki M.D., INC., Defendants/Cross-claim Defendants,
John Does 1-10; Jane Does 1-10; Doe Partnerships 1-10; Doe Corporations 1-10; Doe "Non-Profit" organizations 1-10; and Roe Governmental Entities 1-10, Defendants.
No. 28324.
Supreme Court of Hawai`i.
March 20, 2008.
*542 Kimberly Tsumoto Guidry (Dorothy Sellers, with her on the brief, and Girard Lau), Deputy Attorneys General, for defendantsappellants Department of Human Services, State of Hawai`i.
Vladimir Devens (Andrew S. Winer and William Meheula, with him on the brief, of Winer Meheula & Devens), Honolulu, for plaintiffs-appellees.
MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; LEVINSON, J., and ACOBA, J., concurring separately.
Opinion of the Court by MOON, C.J.
Following a sixteen-day bench trial, defendants-appellants Department of Human Services (DHS) and State of Hawai`i (State) [hereinafter, collectively, DHS or the State] appeal from the Circuit Court of the Second Circuit's[1] January 22, 2007 second amended judgment, entered in favor of plaintiffs-appellees George Kaho`ohanohano (George), as next friend of his minor granddaughter, Dasia Marie Morales-Kaho`ohanohano (Minor), and Jarrett K. Kaho`ohanohano (Jarrett), individually as Minor's natural father, [hereinafter, collectively, the Kaho`ohanohanos] in this negligence action, awarding them $243,071.39 in special damages, $800,000.00 in general damages, and $77,369.80 in costs, for a total of $1,120,441.10. Upon application by the Kaho`ohanohanos, the case was transferred to this court, pursuant to Hawai`i Revised Statutes (HRS)  602-58(b)(1) (Supp. 2007) (governing transfer upon the ground that the case involves "question of first impression or a novel legal question"), on November 15, 2007. Oral argument was held on February 21, 2008.
Briefly stated, two-and-a-half year old Minor suffered a fracture of the left femur on February 14, 2001 and life-threatening abdominal injuries two months later on April 16, 2001. Both injuries allegedly occurred while Minor was in the care and physical custody of her natural mother, defendant Denise Morales (Denise), and Denise's then-boyfriend, defendant Daryl Ramos (Daryl).[2] Denise and Jarrett shared joint physical custody of Minor, who stayed with each parent on a rotating weekly basis. Although the first injury was reported to DHS as a suspected child abuse case, DHS allowed Denise to continue her joint custody arrangement with Jarrett while DHS investigated the circumstances of Minor's injury. DHS had yet to complete its investigation when the second injury occurred, which was determined to have resulted from child abuse. Ultimately, Jarrett obtained sole legal and physical custody of Minor.
On January 9, 2003, the Kaho`ohanohanos commenced a negligence action against DHS, Denise, and Daryl. Essentially, the Kaho`ohanohanos alleged that DHS failed to: (1) protect Minor; (2) timely take custody of her; and (3) conduct a reasonable and competent investigation of the suspected report of child abuse. After a lengthy bench trial, the trial court found in favor of the Kaho`ohanohanos, ruling, inter alia, that: (1) DHS had a legal "duty to provide Minor with prompt and ample protection from future *543 harm and to conduct an appropriate and professionally competent investigation" under HRS chapter 587 (the Child Protective Act); (2) DHS breached its duty based upon the "professional judgment" standard of care enunciated in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982);[3] and (3) such breach was a "significant causal connection" to Minor's April 16, 2001 injuries. The trial court also found DHS liable for damages resulting from the negligent infliction of emotional distress (NIED). Damages were apportioned, jointly and severally, among DHS (29%), Denise (20%), and Daryl (20%).[4]
On appeal, DHS challenges the aforementioned trial court's conclusions, as well as the circuit court's earlier grant of the Kaho`ohanohanos' motion for partial summary judgment[5] that collaterally estopped DHS from relitigating whether Minor's April 16, 2001 injuries occurred while in Denise's care in light of a prior oral ruling made by the Family Court of the Second Circuit in a separate custody proceeding.[6] DHS maintains that the trial court wrongly concluded that DHS had a legally cognizable duty to protect all children within its investigatory ambit, including those outside its legal or physical custody. Relying on HRS  662-2 (1993),[7] DHS maintains ÔÇö for the first time on appeal ÔÇö that liability can only be imposed upon a governmental entity if such liability can be imposed upon a private individual in analogous circumstances [hereinafter, the private analog exception]. Because no analogous situation exists where a private individual could be held liable to the Kaho`ohanohanos for "failing" to protect Minor ÔÇö a non-custodial child ÔÇö from harm, DHS submits that it, likewise, cannot be held liable.
For the reasons more fully discussed infra, we affirm the trial court's January 22, 2007 second amended judgment.

I. BACKGROUND

A. Factual Background
The relevant factual background of this lawsuit is drawn from the 249 unchallenged findings entered by the trial court in its December 4, 2006 first amended findings of fact (FOFs), conclusions of law (COLs), decision and order [hereinafter, the first amended trial order], entered in favor of the Kaho`ohanohanos. Inasmuch as the FOFs are not challenged on appeal, they are binding on this court. Okada Trucking Co. v. Bd. of Water Supply, 97 Hawai`i 450, 458, 40 P.3d 73, 81 (2002).
1. Relevant Statutory Provisions
The laws governing DHS's investigation of child abuse are codified in the Child Protective Act, HRS chapter 587. Section 587-1 (2006) provides in pertinent part that:
The legislature finds that children deserve and require competent, responsible parenting and safe, secure, loving, and nurturing homes. The legislature finds that children who have been harmed or are threatened with harm are less likely than other children to realize their full educational, *544 vocational, and emotional potential, and become law-abiding, productive, self-sufficient citizens, and are more likely to become involved with the mental health system, the juvenile justice system, or the criminal justice system, as well as become an economic burden on the State. The legislature finds that prompt identification, reporting, investigation, services, treatment, adjudication, and disposition of cases involving children who have been harmed or are threatened with harm are in the children's, their families', and society's best interests because the children are defenseless, exploitable, and vulnerable.
The policy and purpose of this chapter is to provide children with prompt and ample protection from the harms detailed herein, with an opportunity for timely reconciliation with their families if the families can provide safe family homes, and with timely and appropriate service or permanent plans to ensure the safety of the child so they may develop and mature into responsible, self-sufficient, law-abiding citizens. . . . Each appropriate resource, public and private, family and friend, should be considered and used to maximize the legal custodian's potential for providing a safe family home for the child.
HRS  587-21 (2006) establishes general procedures and guidelines for the investigation by DHS of suspected child abuse:
(a) Upon receiving a report that a child is subject to imminent harm, has been harmed, or is subject to threatened harm, [DHS] shall cause such investigation to be made as it deems to be appropriate. In conducting the investigation [DHS] may:
(1) Enlist the cooperation of appropriate law enforcement authorities for phases of the investigation for which they are better equipped, and the law enforcement authority may conduct and provide to [DHS] the results of a criminal history record check concerning an alleged perpetrator of imminent harm, harm, or threatened harm to a child; and
(2) Interview a child who is the subject of an investigation without the prior approval of and without the presence of the child's family, including temporarily assuming protective custody of the child for the purpose of conducting the interview, if the action is deemed necessary and appropriate under the circumstances by [DHS] and a police officer.
(b) Upon satisfying itself as to the course of action that should be pursued to best accord with the purpose of this chapter, [DHS] shall:
(1) Resolve the matter in an informal fashion appropriate under the circumstances;
(2) Seek to enter into a service plan,[[8]] without filing a petition in court, with members of the child's family and other authorized agency as [DHS] deems necessary to the success of the service plan . . . ;
(3) Assume temporary foster custody of the child pursuant to section 587-24(a) [(2006)] . . .; [or]
(4) File a petition . . . in court under this chapter.
Further, Hawai`i Administrative Rules (HAR)[9]  17-920.1-11 provides that DHS "shall immediately assess the validity of the report [of suspected abuse] to provide appropriate services to the child and family in accordance with [DHS]'s guidelines." Section  17-920.1-16 also states in relevant part that:
(a) [DHS] shall make a clear decision whether abuse, neglect, or exploitation did or will occur. This decision shall be:
(1) Made within sixty days of the date of complaint;
. . . .
(c) If [DHS] does not confirm abuse, neglect, or exploitation, [DHS] shall make *545 a clear decision whether the child is threatened with harm.
2. The Parties
Jarrett and Denise had dated for approximately three months, but broke up prior to Minor's birth; Minor was born on August 13, 1998. FOF Nos. 2 and 4. As previously stated, Jarrett and Denise shared joint physical custody of Minor, with each parent taking custody of Minor on a weekly rotational basis.
During early 2001, Denise and Daryl became romantically involved; Denise, at times, would refer to Daryl as her fiancÚe. FOF No. 8. Daryl lived in a house in Haiku, on the island of Maui, Hawai`i, on property owned by his family. FOF No. 8. Denise lived with her mother, Ruby Morales (Ruby), on Baldwin Avenue in Paia; however, she spent most of her nights at Daryl's house. FOF No. 9. When in Denise's custody, Minor, too, would spend nights at Daryl's house. FOF No. 9.
3. The February 14, 2001 Injury
a. the incident
Two-and-one-half-year-old Minor sustained a fracture of her left femur some time between 8:00 p.m. on February 13, 2001 and 1:00 a.m. on February 14, 2001 while in Denise's physical custody and at Daryl's home. FOF Nos. 13, 44. At about 3:33 a.m. on February 14, 2001, Denise and Daryl brought Minor to the Maui Memorial Medical Center (MMMC) emergency room. FOF Nos. 15, 16, 29. Upon arrival, Denise reported that she had left Minor sleeping on the futon couch in the living room and that, when she went to check on her, she found Minor on the floor and that her leg looked "twisted." FOF No. 19 (citation to trial exhibit omitted). "The seating area [of the] futon couch was no more than two feet above the ground[,] above a linoleum floor covered by a throw rug." FOF No. 18 (citations to the transcripts omitted). While at the emergency room, Denise called Jarrett to inform him of Minor's injury. FOF No. 16. When Jarrett arrived at the MMMC, Denise essentially recounted to Jarrett what she had told the medical personnel. FOF No. 16. Denise, however, also told Jarrett that Minor never left her sight. FOF NO. 17.
At the MMMC emergency room, Minor was treated by Pedro Giron, M.D. (Dr. Giron), Andrew Fox, M.D. (Dr. Fox), a pediatrician, and William Dixon, M.D. (Dr. Dixon), an orthopedic surgeon, all of whom found the injury "very suspicious." FOF No. 35. Specifically, Dr. Giron explained that "a significant amount of force is required to inflict such an injury," FOF No. 35, Dr. Dixon described the fracture as a "very severe, rare injury," FOF No. 36,[10] and Dr. Fox opined that Minor's injury "was not consistent with Denise and Daryl's explanation that [Minor] sustained the injury by falling off the couch," FOF No. 41. That same day, William Kepler, M.D. (Dr. Kepler), Minor's pediatrician, took over Minor's care. FOF No. 37. Dr. Kepler "noted repeatedly throughout the MMMC records that `[t]here is no adequate explanation for why this femur is broken,' and `[n]o good explanation for the injury.'" FOF No. 38 (citations to the transcripts and trial exhibits omitted). Consequently, MMMC medical personnel contacted the Maui Police Department (MPD), as well as DHS, to report the suspected child abuse. FOF Nos. 19, 38.
b. the police investigation
At 4:10 a.m. on February 14, 2001, MPD officer Melvin Johnson, assigned to conduct a preliminary investigation concerning Minor's femur fracture, interviewed Denise. FOF No. 20. Denise told Officer Johnson that, at approximately 11:00 p.m., she left Minor sleeping on the futon couch in the living room at Daryl's house and that, one hour later, she went to check on Minor and discovered that Minor's left "leg appeared twisted[,]" but "that [Minor] did not complain of any pain." FOF Nos. 21-22. Denise indicated *546 that she and Daryl immediately took Minor to the emergency room. Id. Officer Johnson also interviewed Daryl, whose version of the facts was "somewhat consistent" with Denise's version. FOF No. 23.
MPD Lieutenant Lloyd Yamashita, a detective with the MPD criminal investigation division and trained in the investigation of child abuse cases, was assigned to Minor's case. FOF Nos. 26-27. Lieutenant Yamashita interviewed Denise, who recounted the events as relayed to Officer Johnson, except that Denise further indicated that, after finding Minor on the floor, she took Minor to her bedroom where they fell asleep. FOF No. 28. Denise stated that she woke up later when she heard Minor whimpering again and holding her leg. Id. When Denise pulled down Minor's pajama pants, she noticed the left leg was swollen and turned inwards. Id. She stated Minor was awake, but not crying. At that point, she and Daryl drove Minor to the MMMC. Id. Lieutenant Yamashita also interviewed Daryl, whose account of the events the evening prior was essentially similar to Denise's statement. FOF No. 29. Darryl added that, on the way to the MMMC, he and Denise stopped at Safeway to get some juice and cigarettes. Id. Additionally, Daryl mentioned to Lieutenant Yamashita that there were "weird things happening around his house, spirits at his home." See FOF No. 54.
Pursuant to Lieutenant Yamashita's further investigation, he learned that (1) Daryl had ten arrests with seven convictions, including one conviction for abuse of a family or household member (punching a former girlfriend and biting her nose) in September 2000, FOF No. 31, (2) Minor did not want Daryl with her while in the emergency room, and, (3) according to Jarrett, Daryl had a history of drug use. FOF No. 32. That same day, the MPD submitted a report of suspected physical child abuse to DHS, which was received by DHS at approximately 9:15 a.m. FOF No. 43.
c. DHS's investigation

i. assignment of Minor's case
Upon receiving the MPD's report, an intake case worker with the Child Welfare Services (better known as the Child Protective Services) [hereinafter, CPS], a division within DHS, prepared a preliminary report.[11] FOF No. 45. The report assessed the risk of harm as "high" based upon the "severe vulnerability" posed by Minor's young age, the fractured bone, and the "inconsistency of the explanation of harm." FOF No. 45 (citation to trial exhibit omitted).
On February 15, 2001, CPS's supervisor, Cherie Gnehm-Wright, assigned Minor's case to Ellen Brewerton, a "level four" social worker,[12] to investigate the circumstances surrounding Minor's February 14, 2001 injury and "to determine the likely cause of the fracture and to assess the need for protective services." FOF Nos. 46-47 (citation to trial exhibit omitted).

ii. Ms. Brewerton's investigation
On February 16, 2001, Ms. Brewerton commenced her investigation, speaking first to Lieutenant Yamashita regarding his investigation; he informed her that the injury was one that medical personnel felt could not have been accidental. FOF No. 52. Lieutenant Yamashita also relayed to Ms. Brewerton the substance of his interviews with Denise and Daryl. FOF No. 54. That same day, Ms. Brewerton interviewed Dr. Kepler, who told her that it was highly unusual that Denise did not know how Minor suffered *547 such a severe femur fracture and that the injury was not accidental. However, he also indicated that he did not believe Denise harmed Minor, FOF Nos. 55, 56, and opined that "the only logical explanation was Denise's boyfriend [did]."[13] Ms. Brewerton further noted in her "Log of Contacts"[14] that, before the February 14, 2001 incident, Minor was brought to the emergency room on January 31, 2001
because she fell off the couch onto a linoleum floor. She seemed to be sleepy and had a red oval, five centimeters area on the back of her head. She had a normal neck and skeletal x-rays. This story was totally acceptable, and it does show that she falls off couches.
FOF No. 55 (citation to the trial exhibit omitted) (format altered).
After her initial visit with Minor on February 17, 2001 at the MMMC, FOF No. 58, Ms. Brewerton returned on February 20, 2001 to interview Minor. FOF No. 60. In her Log of Contacts, Ms. Brewerton stated that Minor
provided information of questionable validity [ÔÇö specifically,] that she was not awake when it [ (the injury) ] happened[, t]hat she didn't cry when it happened[, and] that [Denise] was there [when it occurred]. None of that information could be considered reliable.
FOF No. 60. That same day, Ms. Brewerton consulted with Lieutenant Yamashita and decided that Minor would be released to Jarrett after her stay at the MMMC and that "further investigation was necessary as to the safety of Denise, Daryl, and Daryl's home." FOF No. 61. Consequently, Ms. Brewerton directed MMMC personnel to release Minor to Jarrett, and not to Denise, which release occurred on February 22, 2001 (8 days after the date of the injury). FOF Nos. 36, 65. "At this point, DHS and [Ms.] Brewerton considered the investigation to be informal and cooperative and therefore had no intention of involving the family court in custody proceedings. Legal custody remained jointly with Denise . . . and Jarrett[.]" FOF No. 62.
On February 23, 2001, Ms. Brewerton met with Dr. Dixon, who told her that the injury was "a suspicious injury that he could not conceive of happening from falling from a couch. He told Ms. Brewerton that he thought the injury likely involved another person. Ms. Brewerton did not speak to him about the possibility of child abuse." FOF No. 68 (citations to transcript and original emphasis omitted). That same day, Ms. Brewerton conducted an interview with Denise, wherein Denise again related the same story that Minor fell off of the futon couch and injured her leg. See FOF Nos. 67, 70. Ms. Brewerton believed that Denise "was telling what she knew. I didn't have a sense she was lying to me in any kind of way, but it didn't really shed light upon what happened." See FOF Nos. 71-21. Consequently, Ms. Brewerton "suggested that Denise take a polygraph exam because it could expedite custody of [Minor] and give DHS `clarification and assurance that she didn't have anything to do with the injury.'" FOF No. 73 (citation to the transcript omitted).
On February 26, 2001, Denise took her first polygraph examination, the result of which was "inconclusive," but "leaning toward deception"; a second polygraph examination was given the next day, which revealed that Denise "exhibited responses indicative of deception." FOF Nos. 74-77. At the suggestion of Ms. Brewerton, Denise took a third polygraph examination on March 20, 2001, which she passed. FOF No. 100.
Prior to the March 20, 2001 polygraph examination, Ms. Brewerton
advised Denise that[,] because of Denise's willingness to take a lie detector test and *548 "coming forward" to Ms. Brewerton, she was considering allowing [Minor] to return to Denise's custody so long as Denise lived only with her mother, Ruby . . . and not with Daryl.
FOF No. 79 (citation to the transcript omitted). On February 28, 2001, Ms. Brewerton informed Jarrett that the joint-custody arrangement would be resumed, with the condition that Denise be restricted from taking Minor to Daryl's house. FOF No. 80. However, "Ms. Brewerton made no written agreement with Denise, Daryl, and/or Denise's mother, Ruby, concerning the limitation of [Minor]'s contacts with Daryl or his home." FOF No. 82. She advised Ruby that Minor "was not to be alone with Daryl and not to go to Daryl's house and that Denise was to live with [Minor] at Ruby's house" and that "[t]here was no restriction on Daryl being around [Minor] so long as another person was there and it was at a location other than his home." FOF No. 83.
On March 2, 2001, fifteen days after she began her investigation, Ms. Brewerton contacted the CPS Multidisciplinary Team(MDT), whose function was to gather information and make an objective assessment of Denise's ability to care for Minor, to schedule a review of Minor's case.[15] Subsequently, on March 9, 2001, Ms. Brewerton met with Ron Steben, the coordinator for the MDT, to discuss "the questions and information to be presented to the MDT." FOF No. 93. At that time, Ms. Brewerton and Steben contacted John Briley, Jr., M.D. (Dr. Briley), a retired board certified pediatrician frequently sitting as a medical member of MDTs, who informed them that the injury was suspicious. Id. "Ms. Brewerton and Steben then asked Dr. Briley to consider explanations for the fracture which would eliminate abuse as a factor." FOF No. 93 (citations to the transcripts omitted). Thereafter, in a report based upon his review of Minor's medical records, Dr. Briley concluded that it was "almost impossible for a child to fracture any bone falling less than four feet let alone off an even lower futon sofa."[16] FOF No. 102 (emphasis in original) (citation to trial exhibit and internal quotation marks omitted). Steben (with the assistance of Ms. Brewerton) also prepared a summary report in anticipation of the MDT meeting, posing four questions of concern for the MDT to address: "(1) how the injury may happen when it is not caused by another person; (2) what suggestions are there on keeping the child safe; (3) whether this is a `safety issue or . . . just an accident'; and (4) whether the DHS worker should close the case." FOF No. 103 (citation to trial exhibit omitted).
The MDT meeting was held on March 21, 2001. FOF No. 104. The MDT panel consisted of a pediatrician (Dr. Briley), a psychologist, a social work consultant, and a nurse; Ms. Brewerton, Steben, and Denise were also present. FOF No. 104. FOF Nos. 105 to 107 summarize the MDT meeting as follows:
105. While the MDT was aware that Denise passed her third polygraph, Ms. Brewerton did not inform the panel that Denise's previous two polygraphs indicated deception. She also did not inform the panel about Daryl's prior convictions, including his previous abuse conviction.
106. The discussion focused on . . . Steben's reports, polygraphs, Denise's relationship with Daryl, and Dr. Briley's report.

*549 107. Dr. Briley testified that[,] throughout the MDT meeting, he maintained his opinion that the fracture was a result of child abuse.
(Citations to the transcripts and trial exhibits omitted.) Accordingly,
[b]ecause of the manner in which Ms. Brewerton had framed the issue (i.e., an explanation which would emphasize accidental harm), the MDT members concluded that the injury probably happened by someone accidentally stepping on the child and was therefore not abuse. The panel suggested that a public health nurse be invited to inspect and give advice on the physical safety aspects of Daryl's home. Essentially, the emphasis became [a] physical safety issue related to property as opposed to safety issues related to human risk factors.
FOF No. 109 (citation to the trial exhibit omitted).
On March 22, 2001, the day after the MDT meeting, George, Minor's grandfather and a retired MPD captain, informed Ms. Brewerton that, on March 19, 2001, there was a shooting on Daryl's property in Haiku, resulting in Daryl and his friend's arrest. FOF No. 110. George also "expressed his concern about the fact there have been more injuries with his granddaughter since Denise who is a nice girl started going out with Daryl" ÔÇö specifically, referring to the January 31, 2001 and February 14, 2001 injuries. He informed Ms. Brewerton that, prior to the February 14, 2001 injuries, he saw markings on Minor that looked like cigarette burns. Ms. Brewerton testified that she was "surprised that he [was] mentioning cigarette burns because that's the first time that had been mentioned. It certainly had not been mentioned by [Dr.] Kepler or not in any medical reports anywhere." Ms. Brewerton apparently did not pursue the alleged cigarette markings.[17]
With respect to the information relating to Daryl and his friend's arrest on Daryl's property, Ms. Brewerton called Denise, who assured Ms. Brewerton that "she would make certain that any and all of the people involved in the recent shooting were permanently gone from the property." FOF No. 112 (citation to the transcripts omitted) That same day, Ms. Brewerton referred Denise to personal parenting classes and informed her that she would be on vacation the next two weeks. FOF Nos. 113-14.
During the two weeks that Ms. Brewerton was on vacation, "there was no further work or investigation in [Minor]'s case. The Log of Contacts showed an absence of any follow up activity being done regarding the public nurse inspections during Ms. Brewerton's absence." FOF No. 114 (citation to the transcripts and trial exhibits omitted). The trial court found that:
115. Although Ms. Brewerton had returned from her vacation by April 9, 2001 as evidenced by the Log of Contacts, she did not make any attempt to contact the public nurse to get the inspection completed prior to April 16, 2001.
116. DHS is required to make a clear determination whether abuse did or will occur within sixty (60) days of the date of receiving a report of child abuse, "clearly recorded" in DHS's records and shared with and explained to the child's parents and the alleged perpetrator. HAR  17-920.1-16. Sixty days from February 15, 2001 was April 16, 2001.
117. DHS did not make a determination to confirm or unconfirm abuse within 60 days.
118. Ms. Brewerton testified that DHS's decision was to unconfirm abuse for [Minor]'s femur fracture even though it was not entered into the computer in a timely manner. However, there is no evidence of DHS having made a decision by April 16, nor was Ms. Brewerton's testimony in that regard credible.
119. An investigation must either classify the case as "confirm," "unconfirmed," *550 or "unsubstantiated." A case is classified as unsubstantiated if there is frivolous or malicious reporting. The basic test for determining whether or not to confirm the child abuse is a preponderance of the evidence; however, the term is not used in the strict legal sense.
120. Although it is possible to confirm child abuse without identifying the perpetrator, part of the reason Ms. Brewerton did not confirm abuse was because she could not identify the perpetrator. She believed she needed to identify a perpetrator before confirming abuse.
121. [Ms.] Brewerton had personally determined, prior to leaving on her vacation, that Denise was genuine and willing and able to protect her child. However, she still considered Daryl to be[ ] "an unknown quantity."
FOF Nos. 115-21 (citation to the transcripts and trial exhibits omitted). No further action was taken by Ms. Brewerton in Minor's case until Minor was again injured on April 16, 2001. FOF No. 123 (Id. at 9464).
4. The April 16, 2001 Injuries
a. the incident and medical treatments
On the morning of Saturday, April 14, 2001 (a week after Minor's cast from the February 14, 2001 injury was removed), Jarrett returned Minor to Denise's custody for the weekend. FOF No. 125. Other than a runny nose, Minor was in good health at the time. Id. During this weekend, Denise and Minor stayed at Daryl's home. FOF No. 126. With respect to the events that transpired over the weekend and leading up to the April 16, 2001 visit to Dr. Kepler's office, the trial court found:
127. Denise stated that[,] on Saturday, [Minor] "wasn't herself." While at Daryl's house that morning, [Minor] ate[,] but did not want to play with others. Once they left, went to the store, and returned, [Minor] "seemed to be a bit more like herself." Somewhere between 4:00 p.m. and 5:00 p.m., Denise noticed that [Minor] was asleep. She noticed vomit on [Minor] and cleaned it up.
128. Denise and [Minor] feel [sic] asleep on the futon on Saturday night. At some point, Daryl woke Denise up and Denise went to sleep in the bedroom. She woke up to check on [Minor] later in the night and found [Minor] had thrown up twice that night.
129. On Sunday evening, Denise took [Minor] back to [Ruby]'s house. At some point, Denise and [Minor] were sitting at the table, and [Minor] suddenly said, "the blue man threw me down." She was then asked what man and responded, "the other man." When asked what other man, she stated, "the monster man." Denise then asked [Minor] if she was dreaming, and [Minor] responded, "yeah."
130. . . . According to Denise, [Minor] was sleeping with her on the futon bed at Daryl's' [sic] house late Sunday evening. Denise then got up and went into Daryl's bedroom to sleep. She then came back out to the living room at about 11:08 p.m. and saw Daryl looking out the door. She went back to sleep in the bedroom and returned to the living room at about 12:28 a.m., at which time Daryl was sitting in a blue chair. Daryl told Denise he was thinking about things his own children told him about their mother. . . . When Denise woke before 6:00 a.m., Daryl was still in the living room.
131. Denise says she noticed the bruises on [Minor]'s stomach for the first time on Monday morning, April 16, 2001. She thought they may have been due to a lomi lomi massage administered by [Ruby. Minor] threw up again twice on Monday morning.
132. Denise stated that she left [Minor] at Ruby's home on Monday morning. She then took Daryl to Wailuku for a court appearance, went to buy diapers, *551 took Daryl and his children to Haiku, and then went back and picked up [Minor] and took her to the doctor's office.
FOF Nos. 127-32 (citations to the transcripts and trial exhibits omitted).
Upon arriving at Dr. Kepler's office, Minor was in critical condition, i.e., she was gravely ill, mottled, too weak to sit up in Denise's lap, falling backwards, eyes were sunken in, blood pressure was unobtainable, and she had bruises on her chin, back, and abdomen. FOF No. 133. Dr. Kepler immediately called an ambulance to transport Minor to the MMMC. FOF No. 135.
At the MMMC, Mitchell Tasaki, M.D. (Dr. Tasaki), who was the on-call physician, initially observed that Minor
was listless, unable to respond to anything other than severe pain, her blood pressure was dropping, and she exhibited a rigid abdomen. The pain [Minor] was suffering was so severe that a touch to her abdomen would cause her to[ ] "pretty much jump[ ] off the table in pain." [There was] black and blue bruising over [Minor]'s upper abdomen. [Minor] was in severe shock and [in] "very critical" condition.
FOF Nos. 142-43 (citation to the transcripts omitted). After several tests, Minor was diagnosed with severe abdominal injuries.[18] FOF Nos. 138, 146.
Minor underwent immediate surgery because Dr. Tasaki believed that, due to her unstable condition, Minor would not survive the flight to the Kapiolani Medical Center for Women and Children (KMC), located in Honolulu, on the island of O`ahu, Hawai`i. FOF No. 147. During the surgery, "Dr. Tasaki found a large laceration of the proximal jejunum [that] `was almost ripped in two,' a swollen pancreas, and large amounts of intestinal fluid in [Minor]'s abdomen." FOF No. 150 (citation to the transcript and trial exhibit omitted).[19]
While Minor was in surgery, Denise called Jarrett to inform him of Minor's injuries. Jarrett arrived at the MMMC and learned from medical personnel that Minor was suffering from serious life-threatening conditions, FOF No. 139, and that "there was a chance of her expiring," FOF No. 157 (internal quotation marks omitted). Denise also called Daryl to inform him of Minor's injuries, at which time, Daryl began to cry and told Denise "he should never have brought Denise and [Minor] to that evil place and that he wanted the [L]ord to take him instead of her, and . . . how sorry he was about the whole situation." FOF No. 137 (internal quotation marks and citation to trial exhibit omitted).
After surgery, Minor was transported by air ambulance to the KMC, where she underwent additional treatment. FOF Nos. 156, 161-68. Jarrett immediately flew to the KMC to be with Minor. FOF No. 157. During her stay at the KMC, Minor suffered numerous medical conditions resulting from *552 the April 16, 2001 injuries[20] and was placed on morphine or other narcotics to help relieve her severe pain. FOF No. 170. After over two months of extensive-treatment, Minor was finally discharged from the KMC on June 24, 2001. FOF No. 160.
b. the police investigation of the April 16, 2001 incident
Prior to Minor being transferred to the KMC, Lieutenant Yamashita was again called to the MMMC to investigate Minor's injuries. Lieutenant Yamashita spoke with Ruby, who informed him that she believed that Denise had permission from CPS to take Minor to Daryl's house while the femur fracture investigation was being completed. FOF No. 153. He also interviewed Dr. Tasaki, who informed him that "the force of injuries was equivalent to the force sustained in a severe car crash." FOF No. 154 (citation to the transcript omitted).
Additionally, Victoria Schneider, M.D. (Dr. Schneider), a consultant at the KMC and, who was qualified at trial as an expert in the field of pediatrics, was brought in to determine the cause of Minor's injuries. FOF No. 176. Dr. Schneider's examination and conclusion are set forth in FOF Nos. 177 through 182:
177. On April 17, Dr. Schneider informed Ms. Brewerton that [Minor]'s abdominal injuries likely came from a severe blow such as a punch or kick[,] causing the organs to have been pressed against the vertebrae and the back.
178. On April 22, Dr. Schneider prepared a four-page consultation report which concluded that [Minor]'s injuries were the result of child abuse.
179. The nature of the injuries to [Minor] led Dr. Schneider to believe that [Minor] sustained the rib and clavicle fractures between April 12 and April 18. She opined that the injuries occurred from either a single traumatic event or different traumatic events during that time period.
180. Dr. Schneider concluded that [Minor]'s injuries were on "the most severe end" and would have caused [Minor] to suffer "extreme pain."
181. Dr. Schneider saw evidence of direct impact trauma, direct contact forces, and shaking injuries in [Minor]. Dr. Schneider defined "shaking injuries" as those that typically occur when a child is violently shaken by a perpetrator. Dr. Schneider further stated, "You don't see those kinds of bleeds inside the head when a child falls down. This is from . . . the head severely speeding up and slowing down as you see when a child is violently shaken. These are very specific findings in a young child for a shaken baby syndrome."
182. Dr. Schneider ultimately diagnosed [Minor] with "battered child syndrome," which she defined as occurring[ ] "when a child presents with numerous types of injuries from different types of trauma to the child's body from child abuse."
(Citations to the transcripts, trial exhibits, and original emphasis omitted.) Lieutenant Yamashita's investigation eventually led to his arrest of Denise on charges of assault in the second degree and abuse of a family or household member; however, neither Denise nor anyone else was ever prosecuted in relation to Minor's April 16, 2001 injuries. FOF No. 183.
c. DHS's actions post-April 16, 2001
On April 19, 2001, a second MDT meeting in Minor's case was held at the KMC. FOF No. 186. With respect to the MDT meeting and the events that followed, the trial court found in relevant part:
186. . . . Dr. Schneider was one of the members of the MDT [whose] . . . role was to provide her medical opinion as to whether the injuries [Minor] suffered were child *553 abuse. Dr. Schneider concluded that both [Minor]'s femur fracture and her injuries on April 16 were the result of child abuse. In regard to the femur fracture, she indicated that the lack of history from Denise to explain the injury, Denise's statement that [Minor] did not cry, the fact that the force needed to produce a femur fracture was significant, and the lack of history in reporting symptoms led to the conclusion that the injuries were the result of child abuse.
187. The MDT assessed [Minor] as the victim of battered child syndrome.[[21]]
188. On April 20, 2001, [Ms.] Brewerton and [Ms.] Gnehm-Wright signed off on a "Safe Family Home Report"[[22]] in [Minor]'s case. . . . [Therein,] DHS recommended psychological evaluations[[23]] and "comprehensive home-based services." DHS also stated, "the child's physical state at the moment illustrates that she was not protected by anyone."
189. On June 4, 2001, Dr. Tasaki told DHS that [Minor]'s injuries had been caused by "trauma" and that someone had used [Minor] as a "punching bag."
190. DHS eventually confirmed that [Minor] was the victim of child abuse. . . .
FOF Nos. 186-90 (citations to the transcripts and trial exhibits omitted).
During Minor's stay at the KMC, DHS petitioned for temporary foster custody of Minor, which was granted by the family court. Minor was discharged from the hospital and eventually returned to Maui on August 8, 2001 and was placed in a DHS emergency foster home. A guardian ad litem (GAL) was appointed to represent Minor's interest, pending the court's custody decision. On August 12, 2001, the GAL filed a report with the family court, recommending that foster custody be awarded to Jarrett until the resolution of the legal and physical custody issue. The GAL's report further indicated that "[i]t is far past the time for . . . DHS to identify the perpetrator in this case, and[,] if that is not possible[,] then [DHS] should be making reasonable efforts to determine [under] whose care and custody the injuries to [Minor] occurred."
Subsequently, DHS "initiated a family court proceeding" to determine foster custody of Minor. Following a three-day hearing [hereinafter, the foster custody hearing], the family court, on January 8, 2002, orally found that "[t]he evidence as a whole shows that it is more probable than not that [Minor] was harmed while in the physical care of her mother, Denise" and "that [Minor] was not *554 harmed while in the physical care of her father[,] Jarrett[.]" The family court further found that:
[Minor] was injured at least three times while in the mother's care. And all those three injuries, the femur injury involved tremendous force as well as the stomach injury involving tremendous force. The [c]ourt cannot overlook that.
The [c]ourt is simply not adding up experts. However, it's very hard to ignore the various doctors who have testified that [Minor]'s injury occurred while in the mother's care.
. . . .
. . . [T]o me[,] the evidence is clear as to whose care and custody the injury occurred.
Consequently, the family court revoked DHS's foster custody and awarded family supervision custody of Minor to Jarrett. Ultimately, Jarrett was awarded sole legal and physical custody of Minor. See FOF No. 193.
B. Procedural History
1. The Complaint
On January 9, 2003, the Kaho'ohahanohanos filed a complaint against DHS, alleging, inter alia, that DHS "was informed that [Minor] had suffered a femur fracture on February 14, 2001 as a result of child abuse and that DHS: (1) failed to file a petition on behalf of Minor's prior to April 16, 2001; (2) failed to timely take custody of Minor prior to April 16, 2001; and (3) conducted an unreasonable and outrageous investigation of the February report of child abuse."[24]. The Kaho'ohahanohanos, on January 30, 2004, filed their first amended complaint, adding Denise and Daryl as defendants; the Kaho'ohahanohanos alleged that Minor suffered life-threatening injuries at the hands of Denise and Daryl on April 16, 2001 and that they, together with DHS, are liable for negligence, loss of consortium, intentional infliction of emotional distress (IIED), and NIED.
2. Motions for (Partial) Summary Judgment
a. the Kaho'ohahanohanos' motion for partial summary judgment
On June 9, 2005, the Kaho'ohahanohanos moved for partial summary judgment based on ground of collateral estoppel. Specifically, the Kaho'ohahanohanos maintained that:
The [family c]ourt ruled that more probable than not, [Minor] was harmed while in the physical care of [Denise]. The [family c]ourt further ruled that more probably than not, [Minor] was not harmed while in the physical care of [Jarrett]. . . . The [family c]ourt's decision was final and not appealed by any party.
[Therefore,] DHS should clearly be collaterally estopped from re-litigating the same issue in this case that was previously litigated in [the f]amily [c]ourt. If DHS is allowed to re-litigate the exact same issue again, the . . . trial will turn into a re-trial of the prior court action and significantly extend the length of trial, which would require calling the same witnesses to elicit the same testimony.
In response, DHS argued, inter alia, that collateral estoppel did not apply because it was not foreseeable that the custody determination as it relates to the Minor's April 16, 2001 injuries "would be used for money damages against DHS." DHS reasoned that it "was not directly involved in the custody dispute between the parents but rather represented its statutory interest, somewhat akin to a stakeholder. The outcome of the [foster custody hearing] would certainly affect what services DHS would have to provide to the parties after the determination was made."
After a hearing on the motion, the circuit court issued its order granting the Kaho'ohahanohanos' *555 motion [hereinafter, the collateral estoppel order] on October 19, 2005. Essentially, the circuit court adopted the findings made by the family court at the foster custody hearing and ruled that DHS was "collaterally estopped" from relitigating the issue at trial. Thereafter, DHS moved for reconsideration, which was denied by the trial court on November 3, 2005.
b. DHS's motion for summary judgment
Relying on Restatement (Second) of Torts  314(A) (1965),[25] DHS, on June 13, 2005, filed a motion for summary judgment on the ground that DHS did not have custody of Minor after the February 14, 2001 injury and, absent such custody, it had no "special relationship" with Minor that gave rise to a duty of care. DHS further argued that:
Imposing a tort duty on DHS in circumstances like those in the instant case[, i.e., where DHS neither had custody nor control over Minor,] would inevitably skew the decision-making of front line DHS social workers and cause them to take many more children into State custody without and before any hearing, even in the absence of indicia of severe or imminent harm. Inevitably, more parents who are not abusers would watch their children being precipitously removed from their custody ÔÇö one of the most fundamental constitutional interests ÔÇö because caseworkers, like prosecutors, would have to balance the threat of tort actions by the potential victims of abuse against their actions in possible abuse cases. . . . [The] pressures would inevitably cause more cases to be accepted for investigation by the Intake Hotline personnel, and more of the cases investigated to become the subject of petitions to the [f]amily [c]ourt.
(Internal quotation marks omitted.)
In retort, the Kaho'ohanohanos argued that DHS's reliance upon a "special relationship" disregarded its statutory "duty to protect [Minor] from further harm" under HRS chapter 587, which arose when "the femur report was received by DHS." Consequently and as discussed more fully infra, the Kaho'ohanohanos believed that "[t]he child protective statutes were enacted so that DHS would protect children like [Minor] and guard against further abuse; therefore, there is a reasonable and logical connection between DHS's failure to observe the requirements of the statutory scheme and [Minor]'s injuries."
In response to the Kaho'ohanohanos' argument addressing the statutory scheme, DHS asserted that "[n]othing in [Chapter 587], or any other statute[,] makes DHS an insurer of any child's safety, particularly from the criminal acts of third-parties." A hearing on DHS's motion was held on August 18, 2005, the trial court issued its written order, denying DHS's motion [hereinafter, the summary judgment order] on October 28, 2005. As discussed infra, the trial court concluded that: (1) HRS chapter 587 and its administrative rules "manifest a clear intention on the part of the legislature that DHS shall protect children from abuse and reduce the risk of future abuse when it is reported"; (2) CPS "has a statutorily based legal duty to protect children, and had a duty to protect [Minor] in this case"; and (3) "DHS's duty to protect children exists once they are on notice that a significant and unjustifiable or unexplained injury has occurred to a child that is brought to their attention, and there is a reasonable opportunity to verify the injury or the potential risk of future harm." The trial court, although declining to determine whether a duty arose pursuant to a Restatement (Second) of Torts  314(A) "special relationship," observed that, "if one were to take the position which DHS is taking, it may at some level discourage DHS from filing petitions to create a custodial status on behalf of a child to avoid the responsibilities which [HRS chapter 587] impose[s] upon [DHS]."
3. The Bench Trial
The Kaho'ohanohanos' claims, i.e., negligence, NIED, IIED, and loss of consortium, *556 ultimately proceeded to a bench trial on May 8, 2006, which lasted for sixteen days.[26] On September 5, 2006, the trial court issued its written order, essentially ruling in favor of the Kaho'ohanohanos on their negligence and NIED claims. Specifically as to DHS and as discussed more fully infra, the trial court found that: (1) "DHS had a duty to provide [Minor] with prompt and ample protection from future harm and to conduct an appropriate and professionally competent investigation"; (2) DHS breached its duty of care to Minor under the Youngberg "professional judgment" standard of care, see supra note 3; and (3) DHS's breach, along with the res judicata effect of the family court's ruling that Minor was injured while in Denise's care, was causally connected to Minor's April 16, 2001 injuries. COL Nos. 3, 29, 31-45. In addition to finding DHS liable for negligence, the trial court concluded that DHS was liable for NIED upon the Kaho'ohanohanos because "the psychological effects of the April 16 events on [them] are significant." COL Nos. 55, 56. However, the trial court determined that insufficient evidence was adduced to support the claims for IIED and loss of consortium.[27] COL Nos. 12, 59.
Accordingly, the trial court awarded Minor special damages of $243,071.39 and general damages of $750,000.00. COL No. 60-62. An additional $50,000.00 was awarded to Jarrett as general damages on his NIED claim. COL No. 63. The trial court also ordered that liability be apportioned twenty-nine percent to DHS, twenty percent to Denise, twenty percent to Daryl, and thirty-one percent to the health care providers. Although the trial court concluded that Denise and Daryl were jointly and severally liable, it concluded that DHS was not, pursuant to the terms of Act 112 (2006) (passed after trial had commenced in this case but before judgment was issued), which amended HRS  663-10.9 (2006) to eliminate joint and several liability for governmental entities. COL Nos. 64-67. On September 21, 2006, the trial court entered its judgment in favor of the Kaho'ohanohanos.
4. Postjudgment Proceedings
The Kaho'ohanohanos, thereafter, filed their motion for, inter alia, taxation of costs in the amount of $173,639.65. The trial court ultimately granted the Kaho'ohanohanos costs in the reduced amount of $77,369.80. On September 29, 2006, the Kaho'ohanohanos filed a motion to alter and/or amend the judgment. Specifically, the Kaho'ohanohanos argued that the legislature did not intend Act 112 to be applied retroactively if it violated a plaintiff's accrued or substantive rights, which would happen here were Act 112 to apply. The trial court agreed, issuing its first amended trial order on December 4, 2006, ordering DHS jointly and severally liable for the total award, offset by the amount received from the settlement with the health care providers. A first amended judgment was also entered the same day, December 4, 2006.
On December 18, 2006, DHS filed a notice of appeal from the September 21, 2006 judgment and the December 4, 2006 first amended judgment.[28] A second amended judgment was thereafter entered on January 22, 2007. DHS timely appealed from the second amended judgment on February 14, 2007. Upon motion by the Kaho`ohanohanos pursuant to HRS  602-58(b)(1), the case was transferred to this court on November 15, *557 2007 and, as previously stated, heard oral argument on February 21, 2008.

II. STANDARDS OF REVIEW

A. Subject Matter Jurisdiction
"The applicability of the doctrine of sovereign immunity has been considered an element of subject matter jurisdiction." Ahuna v. Dep't of Hawaiian Home Lands, 64 Haw. 327, 333 n. 9, 640 P.2d 1161, 1165 n. 9 (1982) (citations omitted). "Whether a court possesses subject matter jurisdiction is a question of law reviewable de novo." Hawai`i Mgmt. Alliance Ass'n v. Ins. Comm'r, 106 Hawai`i 21, 26, 100 P.3d 952, 957 (2004) (internal quotation marks and citation omitted).
B. Statutory Interpretation
"The interpretation of a statute is a question of law which this court reviews de novo. Where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." Liberty Mut. Fire Ins. Co. v. Dennison, 108 Hawai`i 380, 384, 120 P.3d 1115, 1119 (2005) (internal quotation marks and citation omitted). "Additionally, the general principles of construction which apply to statutes also apply to administrative rules." Brown v. Thompson, 91 Hawai`i 1, 9, 979 P.2d 586, 594 (1999) (citation and internal quotation marks omitted).
C. COLS
A COL is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.
Estate of Klink ex rel. Klink v. State, 113 Hawai`i 332, 351, 152 P.3d 504, 523 (2007) (internal quotation marks, citations, and brackets omitted) (format altered).

III. DISCUSSION

As previously stated, DHS advances several points of error committed by the trial court ÔÇö to wit, that the trial court erred in: (1) determining that DHS had a cognizable legal duty to protect Minor from harm; (2) misapplying the Youngberg professional judgment standard of care to conclude that DHS breached its duty to Minor; (3) concluding that DHS's breach resulted in Minor's April 16, 2001 injuries and relying upon the family court's ruling in the foster custody hearing to collaterally estop DHS from proving that Minor's injuries occurred while in Jarrett's care; (4) finding DHS liable for NIED upon the Kaho`ohanohanos; and (5) ordering DHS jointly and severally liable. DHS also contends that the trial court erred in imposing liability upon DHS because DHS, as a state agency, was sovereignly immune from the present action, pursuant to the private analog exception of the State Tort Liability Act (STLA), HRS  662-2. The Kaho`ohanohanos point out that the aforementioned contention was not raised by DHS at the trial court level and that DHS raised only the STLA's "discretionary function" exception defense, which the trial court concluded did not apply and which DHS is not appealing. See supra note 27.
We agree with the Kaho`ohanohanos that DHS's claim of sovereign immunity based upon the private analog exception is raised for the first time on appeal. However, inasmuch as "[t]he applicability of the doctrine of sovereign immunity has been considered an element of subject matter jurisdiction," Ahuna, 64 Haw. at 333 n. 9, 640 P.2d at 1165 n. 9 (citations omitted), and "[j]urisdiction is the base requirement for any court resolving a dispute[,]" County of Kaua`i v. Baptiste, 115 Hawai`i 15, 25, 165 P.3d 916, 926 (2007) (internal quotation marks and citation omitted), we are obliged to first ensure that this court has jurisdiction. We, therefore, first examine DHS's claim of sovereign immunity.
*558 A. The Doctrine of Sovereign Immunity
1. Overview of the Private Analog Exception (HRS  662-2)
Under the doctrine of sovereign immunity, claims against the State are barred unless "there has been a clear relinquishment of immunity and the State has consented to be sued." Bush v. Watson, 81 Hawai`i 474, 481, 918 P.2d 1130, 1137 (1996) (internal quotation marks and citation omitted). The State has waived immunity to suit only to the extent specified in HRS chapters 661 and 662. Taylor-Rice v. State, 105 Hawai`i 104, 110, 94 P.3d 659, 665 (2004) (footnote omitted) [hereinafter, Taylor-Rice II]; Figueroa v. State, 61 Haw. 369, 383, 604 P.2d 1198, 1207 (1979) (The STLA, enacted in 1957, is "a specific waiver of tort immunity.").
HRS  662-2, upon which DHS relies, expressly waives the State's sovereign immunity in cases where liability arises from "the torts of its employees" and declares that the State "shall be liable in the same manner and to the same extent as a private individual under like circumstances[.]" (Emphasis added.) Through its adoption of HRS  662-2,
the legislature definitely expressed the intent that, for purposes of determining the liability of the State in tort cases, all the accepted tort law relating to private parties is applicable. However, several exceptions to the general waiver of immunity from tort claims are set forth in HRS  662-15 [(Supp.2007), none of which apply here]. Consequently, [this court] ha[s] held that, if a private party would be liable under the circumstances, then the State would also be liable, except for those claims enumerated in HRS  662-15.
Doe Parents No. 1 v. State of Hawai`i, Dep't of Educ., 100 Hawai`i 34, 59, 58 P.3d 545, 570 (2002) (emphases added) (internal quotation marks, original brackets, ellipsis, and citations omitted). Stated differently, the STLA
d[oes] not waive governmental immunity in all cases and [it] d[oes] not create any cause of action where none existed before. The effect of the [STLA] is to waive immunity from traditionally recognized common law causes of action in tort, other than those expressly excluded[, see HRS  662-15]. It was not intended to visit the sovereign with novel liabilities.

Figueroa, 61 Haw. at 384, 604 P.2d at 1207 (emphases added) (citations omitted). The State, thus, remains immune from liability based upon governmental functions for which no private analog exists and waives its immunity only to the extent a plaintiff's claim for relief is comparable to a recognized claim for relief against a private person. Accordingly, whether the State is entitled to immunity under HRS  662-2 depends on whether a private person would be liable under "like circumstances." Although this court has had occasion to review and consider the application of HRS  662-2, it has not explicitly considered the extent to which the State has waived its immunity under "like circumstances." We, therefore, turn to federal cases for guidance based upon this court's recognition that "federal immunity principles are relevant to our own principles of sovereign immunity." Taylor-Rice II, 105 Hawai`i at 110, 94 P.3d at 665 (internal quotation marks, citations, and ellipsis omitted).
The Federal Tort Claims Act (FTCA), upon which the STLA is modeled, Figueroa, 61 Haw. at 383-84, 604 P.2d at 1206, provides that the United States shall be liable under state tort law only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C.  2674 (2000) (emphasis added); see also 28 U.S.C.  1346(b) (2000) (liability exists "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred"). In Reynolds v. United States, 927 F.Supp. 91 (W.D.N.Y.1996), the United States District Court for the Western District of New York explained that the "like circumstances" language
plays an important role in the interpretation of the statute. The "like circumstances" language . . . means that the liability assumed by the [g]overnment is that created by all the circumstances, not that which a few of the circumstances might create. . . . Thus, notwithstanding any circumstances in which state law would hold a *559 private person liable for his acts, if those circumstances are in any material respect not "like" those in which the government's act occurred, there has been no FTCA waiver of sovereign immunity.
Id. at 96-97 (internal quotation marks, citations, and ellipsis omitted). The United States Court of Appeals for the Tenth Circuit succinctly stated that:
The "like circumstances" inquiry is designed to prevent state legislatures from using the United States' waiver of sovereign immunity under the FTCA as an occasion to "enrich their own citizens at the expense of the deepest pocket." Carter v. United States, 982 F.2d 1141, 1143 (7th Cir.1992). This goal is accomplished by requiring the United States' liability to be measured by reference to the liability of private parties. Recognizing that the United States is seldom situated identically to private parties, however, the "like circumstances" inquiry requires only that the United States be analogized to a similarly situated private party. Indian Towing Co. v. United States, 350 U.S. 61, 64, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1055); . . . [.] Nice pieces of casuistry and hypersensitive legalisms are to be avoided in interpreting this language.
Nationwide Mut. Ins. Co. v. United States, 3 F.3d 1392, 1396 (10th Cir.1993) (internal quotation marks, other citations, and original brackets omitted); see also Feres v. United States, 340 U.S. 135, 142, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (the FTCA's "effect is to waive immunity from recognized causes of action and was not to visit the [g]overnment with novel and unprecedented liabilities"); Zabala Clemente v. United States, 567 F.2d 1140, 1149 (1st Cir.1978) ("even where specific behavior of federal employees is required by federal statute, liability to the beneficiaries of that statute may not be founded on the [FTCA] if state law recognizes no comparable private liability").
Hence, the threshold issue is whether the Kaho`ohanohanos' factual allegations satisfy the necessary elements of a cause of action against the State comparable to one that may be maintained against a private person, i.e., whether the alleged tort has a private analog to render the State's immunity waived.
2. The Private Analog Exception as Applied to This Case
On appeal, DHS argues that there is no private analog to the instant action because "an ordinary private individual could not be held liable for `failing' to protect a non-custodial child from harm." DHS submits that:
The law simply does not impose a legal duty upon any person to protect abused children. It is true that any individual could voluntarily intervene to protect a particular child, thus creating a special relationship and the concomitant assumption of liability for any negligence in the "rescue." But that situation would be analogous to DHS'[s] assumption of custody over a child by court order. A private individual cannot be liable for merely "investigating" the safety of a child. By analog, neither can the State. The STLA specifically retains sovereign immunity for torts committed by State employees when no similar liability would be imposed on private individuals.
The Kaho`ohanohanos, relying upon Sabia v. State, 164 Vt. 293, 669 A.2d 1187 (1995), contend that there is a private analog to hold DHS liable.
In Sabia, the Vermont Supreme Court was faced with an issue similar to the instant case. In that case:
Plaintiff Toni Patterson, who was twenty-two years old when she filed suit in May 1992, was first sexually abused by her stepfather . . . at the age of six or seven. She was thirteen years old in 1983 when she reported the abuse to a teacher, who informed [Vermont's counterpart to Hawaii's DHS ÔÇö Department of Social and Rehabilitation Services (SRS)]. An SRS supervisor met with Toni and the teacher in March 1983, at which time the supervisor stated that she would be in touch, and that either Toni or her stepfather would be removed from the home. No action was taken.
Plaintiff Terri Sabia, who is three years younger than her sister[, i.e., Toni,] was *560 sexually abused by her stepfather beginning at age five. When Terri was approximately seven years old, a babysitter reported to SRS that she had observed physical signs of sexual abuse while bathing Terri. Apparently, nothing was done in response to the report. In 1983, when Terri was eleven years old, she reported to the school nurse and principal that [her stepfather] had sexually assaulted her. School officials notified the director of the Franklin County Family Center, who investigated and reported to SRS that [the stepfather] had admitted having sexual intercourse with Toni and "touching" Teri. SRS took no action in response to the report. The continuing abuse was reported to SRS again in 1986, but again nothing was done. [The stepfather]'s sexual abuse of [Toni and Terri (collectively, the plaintiffs)] continued unabated until 1987.
669 A.2d at 1190. The plaintiffs commenced suit against the State of Vermont (the state), alleging that SRS failed to protect them after receiving repeated reports of continuing sexual abuse. Id. The state moved for judgment on the pleading, which the trial court granted, dismissing the plaintiffs' action based upon its finding that the state had not waived its immunity to suit. Id. at 1191.
On appeal, the plaintiffs challenged the trial court's ruling of sovereign immunity, arguing that, because a private analog existed, their action against the state was permissible. Id. Under the Vermont Tort Claims Act (VTCA):
The state of Vermont shall be liable for injury to persons caused by the negligent or wrongful act or omission of an employee of the state while acting within the scope of employment, under the same circumstances, in the same manner and to the same extent as a private person would be liable to the claimant[.]
Id. (quoting 12 V.S.A.  5601(a)) (emphasis in original) (ellipses omitted). The court, believing that the resolution of the private analog issue required it to examine the first element of the plaintiff's negligence action (i.e., duty), proceeded in the first instance to determine whether the state owed a statutory duty of care to the plaintiffs. Id. (stating that "we determine whether [a statutory] duty exists under the circumstances" before reaching the private analog inquiry); see also Kane v. Lamothe, 936 A.2d 1303, 1307 n. 3 (Vt.2007) ("no-duty rules and immunity rules are often two sides of the same coin") (citing 1 D. Dobbs, The Law of Torts  225, at 577 (2001) ("The similarities between no-duty rules and immunity rules are so great that the two terms can often be used interchangeably[.]")). In so doing and having concluded that a statutory duty existed, the court examined whether the state was immune from suit where SRS neglected its statutory duty to provide assistance to children seeking protection from sexual abuse. Sabia, 669 A.2d at 1192-93.
Initially, the court rejected as "too narrow[ ]" SRS's argument that no private analog existed because only the government can remove children from their homes. Id. at 1193. Instead, the court asked whether "a private analog exist[ed] for an action based on SRS's failure to perform its statutory duty to assist children seeking protection from reported and substantiated abuse." Id. The court found a private analog under several common-law tort principles,[29] including *561 Restatement (Second) of Torts  315(b) (1965). Id. at 1195. Section 315 provides that:
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection.
The Sabia court, in concluding that an analogous situation can be found in section 315(b), explained that:
While in most cases the "special relationship" requires that the actor have custody of the other, as in a prison or school setting, see Restatement  314A(4) (special relation created when person is required by law to take custody of another under circumstances that deprive other of normal opportunities for protection), courts have not always required a custodial relationship under facts similar to this case. See Estate of Bailey by Oare v. County of York, 768 F.2d 503, 509 (3d Cir.1985) (citing Jensen v. Conrad, 747 F.2d 185, 194 (4th Cir.1984), for proposition that abused child's right to protection can exist absent custodial relationship between child and agency required to protect child); Turner[ v. Dist. of Columbia, 532 A.2d 662, 667, 673 (D.C.1987)] (report of child abuse created "special relationship" between specifically identified child and agency statutorily required to protect abused children).
Id. (original ellipsis and footnote omitted).
Accordingly, the court concluded that, "[w]hen a special relationship such as this is created, social policy considerations warrant the imposition of liability on the party charged with the duty to protect those who depend on that protection, not only to provide compensation to the abused children but to encourage the protective agency to perform its duty diligently in the future." Id. at 1196 (footnote omitted). The Sabia court ultimately reversed the trial court's grant of judgment on the pleadings in favor of SRS. Id. at 1199.
Here, the Kaho`hanohanos urge this court to follow the rationale of the court in Sabia and conclude that DHS's negligent conduct in investigating and protecting Minor from further injuries is "analogous to a private individual's violation of . . . the cited [sections of the] Restatements" by the Sabia court. DHS disagrees, arguing that:
The liability imposed upon private individuals under Restatement (Second) of Torts . . . is not analogous to the situation here ÔÇö DHS's investigation of [Minor]'s safety. Civil liability cannot be imposed on a private individual until he or she has affirmatively acted in a way that detrimentally affects another. The private/public analog would only exist, if, for example, DHS took custody of [Minor] or otherwise took measures to change the existing court-ordered custodial arrangement.
(Original brackets omitted.) (Emphases in original.)
Although the court in Sabia believed it necessary to first address the substantive question whether the state owed a duty to the plaintiffs prior to resolving the jurisdictional issue involving the private analog exception, this court has previously stated that, when reviewing a case to determine whether the circuit court has jurisdiction, we "retain[ ] jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction." Amantiad v. Odum, 90 Hawai`i 152, 159, 977 P.2d 160, 167 (1999) (emphasis added) (citation omitted). Consistent with this court's policy, the United States Court of Appeals for the Second Circuit announced simply that,
for liability to arise under the FTCA, a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction . . ., and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action. Nichols v. Block, 656 F.Supp. 1436, 1446 (D.Mont. 1987); see United Scottish Ins. Co. v. *562 United States, 614 F.2d 188, 195-96 (9th Cir.1979).
Chen v. United States, 854 F.2d 622, 626 (2d Cir.1988) (emphases added) (internal quotation marks and other citations omitted); see also Rochon v. State, 177 Vt. 144, 862 A.2d 801, 803 (2004) ("The waiver requires plaintiffs to show that their allegations, taken as true, will satisfy the necessary elements of their comparable state cause of action." (Internal quotation marks and citation omitted.)).
In this case, the Kaho`ohanohanos' claims against DHS (that are being challenged on appeal) consist of negligence and NIED. Specifically, in their first amended complaint, the Kaho`ohanohanos alleged that:
15. [DHS] negligently failed to take custody and otherwise protect [Minor] from further abuse and injuries.
16. [DHS was] negligent in failing to protect and/or care for [Minor] from further abuse and injuries, including but not limited to negligently failing to properly train and supervise their employees, agents and/or representatives.
17. [DHS] breached its duty to take reasonable and foreseeable precautions arising out of the reported "child abuse" suffered by [Minor], including but not limited to an unreasonable and outrageous investigation, acts and omissions, which [DHS] engaged in following the process of "investigating" the allegations of "child abuse."
. . . .
19. As a result of the negligence of [DHS] . . ., [Minor] sustained physical and mental injuries[.]
21. [DHS is] liable for negligence and [NIED] on [the Kaho`ohanohanos].
Consequently, based upon the above allegations, the dispositive jurisdictional inquiry is whether a private analog existed for an action based on DHS's failure to perform its alleged statutory duty to assist children seeking protection from reported abuse.
Taking the above quoted allegations as true and assuming the existence of a duty upon DHS to protect Minor, see discussion infra, we believe the Kaho`ohanohanos have met their burden of demonstrating the existence of a private analog that satisfies the necessary elements under Restatement (Second) of Torts  315(b), as the Sabia court so held, see 669 A.2d at 1195. As previously quoted, section 315 provides in pertinent part that: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . (b) a special relation exists between the actor and the other which gives to the other a right to protection." (Emphasis added.) See Doe Parents No. 1, 100 Hawai`i at 71, 58 P.3d at 582 (analyzing section 315 in the context of the department of education's duty to parents and students); McKenzie v. Hawai`i Permanente Med. Group, Inc., 98 Hawai`i 296, 299-300, 47 P.3d 1209, 1212-13 (2002) (analyzing section 315 in the context of physician's duty to non-patient third parties injured as a result of negligently prescribing medication). Thus, assuming that DHS had a legal duty to protect Minor in the first instance, as the Kaho`ohanohanos allege it did, a "special relation" would undoubtedly exist between DHS and Minor such that DHS's duty would encompass a duty to prevent further physical harm to Minor upon reports of physical abuse. Having concluded that a private analog is present in the form of a "special relationship" contained in Restatement (Second) of Torts  315, we hold that the Kaho`ohanohanos have met the threshold requirement of a claim against DHS.[30]
B. Negligence
1. Legal Duty
"A fundamental requirement of a negligence action is the existence of a duty *563 owed by the defendant to the plaintiff,"[31]Namauu v. City & County of Honolulu, 62 Haw. 358, 361, 614 P.2d 943, 945 (1980) (citations omitted), that requires the defendant "to conform to a certain standard of conduct for the protection of others against unreasonable risks," Birmingham v. Fodor's Travel Publ'ns, Inc., 73 Haw. 359, 366, 833 P.2d 70, 74 (1992) (internal quotation marks and citations omitted).
The general rule is that a person does not have a duty to act affirmatively to protect another person from harm. The fact that the actor realizes or should realize that action on his or her part is necessary for another's aid or protection does not of itself impose upon him or her a duty to take such action.
The exceptions to this general rule arise when a "special relationship" exists between the actor and the individual facing harm.
Lee v. Corregedore, 83 Hawai`i 154, 159, 925 P.2d 324, 329 (1996) (internal quotation marks, citation, and original brackets omitted); 57A Am.Jur.2d, Negligence  82 (2004) ("[t]he relationship which gives rise to a duty may be created by . . . statute") (footnote omitted). Accordingly, a "special relation" between DHS and Minor is required to give rise to a duty on DHS's part to protect Minor from harm. However, we are mindful of the principle that:
Government is not intended to be an insurer of all the dangers of modern life, despite its ever-increasing effort to protect its citizens from peril. Despite our expanding expectations of government action, we do not hold that government is liable for all injuries sustained by private persons as a result of governmental activity, even though doing so would spread the losses over the largest possible base[.]
In deciding whether a duty exists or not, we must determine how far it is desirable and socially expedient to permit the loss distributing function of tort law to apply to governmental agencies, without thereby unduly interfering with the effective functioning of such agencies for their own socially approved ends. Government entities are mandated by law to perform a variety of activities of private persons. Our system of separate but equal branches of government demands restraint on the part of the courts from reordering priorities and forcing reallocation of resources upon the other branches which make policy decisions in this regard.
Cootey v. Sun Inv., Inc., 68 Haw. 480, 485, 718 P.2d 1086, 1090-91 (1986) (internal quotation marks and citations omitted).
In this case, the trial court, relying upon a special relationship established in HRS chapter 587, found that
DHS received several reports that [Minor] had been harmed and was able to substantiate the significant injury immediately subsequent to the reports. From the point of confirming the injury, DHS had a duty to provide [Minor] with prompt and ample protection from future harm and to conduct an appropriate and professionally competent investigation.
COL No. 29. DHS maintains ÔÇö as it did before the trial court ÔÇö that no cognizable legal duty exists between it and Minor and that, therefore, the trial court erred in finding otherwise. Specifically, DHS argues that, absent an express intent by the legislature to create such a duty, there was no duty owed to Minor:
[N]othing in the plain language of HRS chapter 587 even hints that the legislature intended to impose a legal duty on DHS. . . .
Section 587-1 sets forth the legislative's aspirational policy goals. There is nothing said in this section, or elsewhere in the chapter, of legal duty.
. . . The legislature purposely declined to impose a legal duty of care on DHS. Nothing in the statutes or its legislative history mentions, or even suggests, that the State has a legal duty to non-custodial *564 children, or that the state shall be liable for injuries to non-custodial children.
. . . .
The legislature recognized that the community and DHS social workers play an important role in preventing abuse. The legislature has thus characterized child abuse prevention as a cooperative public effort. If the State has a responsibility to abused children, then so does the public at large. But neither the State nor the public may be held liable for money damages under Chapter 587. The legislatively imposed responsibility to protect Hawai`i children is forward-looking and aspirational.
(Emphasis in original.) Furthermore, DHS contends that, as a matter of sound public policy, this court should not infer that HRS chapter 587 creates a legal claim for relief inasmuch as that chapter "was not created to make non-abusing State an insurer of all children's safety":
It is true that the legislature, in enacting Chapter 587, wanted to protect children, so it prescribed a child protective framework it hoped would be successful, but that is a far cry from assuming the legislature wanted legal liability to be imposed on the State when an employee, in honestly attempting to follow that framework, may have made a decision that could later be characterized as negligent. Absent any language in the statutes or legislative history suggesting that the legislature, in enacting Chapter 587, wanted to go beyond providing a directory framework and took the substantial and significant additional step of imposing legal liability where negligence occurs, no legally enforceable duty can be found. This is especially so as Chapter 587 also recognized the competing goal of keeping families together as much as possible, see HRS  587-1, making it even more unlikely that the legislature wanted liability to be imposed for a single miscalculation that served this competing goal.
Imposing liability would simply tilt the balance towards removing children where there is even the remotest possibility of a safety risk, thereby undermining the other goal keeping families together, as well as needlessly inflicting emotional distress on the removed child. And even if the policy choice were rational, at the very minimum, this [c]ourt should not adopt it where the statutory language and history provides no support for that choice. At a very minimum, this [c]ourt should not take the further step of imposing liability to enforce that policy choice, where no language suggesting liability or duty exists.
(Emphases and footnote omitted.)
It is a well-established rule of statutory construction that this court's
foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And [this court] must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
Aluminum Shake Roofing, Inc. v. Hirayasu, 110 Hawai`i 248, 251, 131 P.3d 1230, 1233 (2006) (citation omitted) (format altered). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." HRS  1-16 (1993).
As previously quoted, the purpose of the Child Protective Act was: (1) "to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm"; (2) to provide "prompt identification, reporting, investigation, services, treatment, adjudication, and disposition of cases involving children who have been harmed or are threatened with harm," which are "in the children's, their families', and society's best interests because the children are defenseless, exploitable, and vulnerable"; and (3) "to provide children with prompt and ample protection from the harms[,] with an opportunity for timely reconciliation with their families if the families can provide safe family homes, and with timely and appropriate service or permanent plans to ensure the safety of the child so they may develop and mature into responsible, self-sufficient, law-abiding citizens." HRS  587-1.
*565 To achieve the above purposes, HRS  587-21 states that, in response to a report of abuse, DHS "shall cause such investigation to be made as it deems to be appropriate."[32]See also HAR  17-920.1-7 (DHS "shall document the complaint[, i.e., the report of abuse, neglect, exploitation, harm or threatened harm,] on a prescribed form which shall serve as a written application for social services." (Emphases added.)). Indeed, HAR  17-920.1-1 also states that DHS "shall provide protective services immediately to a child who is the subject of a report," (emphases added), to:
(1) Protect from harm or threatened harm; or
(2) Prevent abuse or neglect of a child; and
(3) Preserve, rehabilitate, or reunite families in a safe home by removing barriers to healthful development, adequate care and protection, and adequate parental or familial functioning.
HAR  17-920.1-11(a) further provides that DHS "shall immediately assess the validity of the report to provide appropriate services to the child and family." (Emphases added.) In verifying the validity of the report, DHS must:
(1) Evaluate the report or complaint to insure that it is based on fact;
(2) Take action as soon as possible in order to provide immediate protection to the child;
(3) Discuss the report or complaint directly with the parents, guardians, or custodians preferably through a home visit by:
(A) Interpreting [DHS]'s services and legal authority to protect children;
(B) Discussing specific reasons for [DHS]'s entry in the particular situation;
(C) Evaluating whether the complaint is justified; and
(4) Seeing the child as soon as possible to evaluate the extent to which the child is threatened with harm.
HAR  17-920.1-11(e). DHS is also required to

obtain a written psychiatric report, psychological report, or other multidisciplinary consultant team evaluation on the child, or appropriate family members when the actual or potential threat to the child is believed to be serious and one or more of the following conditions exist:
(1) It is difficult to determine whether abuse or neglect has occurred[.]
. . . .
[DHS] shall make a social study of the child and family to determine:
(1) Whether abuse, neglect, exploitation, or harm did or will occur;
(2) The extent of or threat of harm to the child;
(3) The potential risk of future or continued harm to the child[;]
(4) If important changes need to take place in the family before the child may be expected to have safe and adequate care; [and]
. . . .
(8) How much departmental supervision is needed to assure the child will not be exposed to harm or threatened harm while the family seeks to carry out needed changes.
HAR  17-920.1-15(e)-(f) (emphases added). HRS  587-25 (2006) also indicates that DHS "shall . . . fully consider[,]" (emphases added), the following guidelines, which include, inter alia:
(1) The current facts relating to the child which include:
(A) Age and vulnerability;
(B) Psychological, medical and dental needs;
(C) Peer and family relationships and bonding abilities;
(D) Developmental growth and schooling;
(E) Current living situation;
(F) Fear of being in the family home; and
(G) Services provided the child;

*566 (2) The initial and any subsequent reports of harm and/or threatened harm suffered by the child;
. . . .
(4) Historical facts relating to the alleged perpetrator and other appropriate family members who are parties[;]
(5) The results of psychiatric/psychological/developmental evaluations of the child, the alleged perpetrator and other appropriate family members who are parties;
(6) Whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the family home;
(7) Whether there is a history of substance abuse by the child's family or others who have access to the family home;
. . . . ;
(9) Whether the non-perpetrator(s) who resides in the family home has demonstrated the ability to protect the child from further harm and to insure that any current protective orders are enforced; [and]
(10) Whether there is a support system of extended family and/or friends available to the child's family[.]
Additionally, DHS mandates ÔÇö in its Green Book ÔÇö that its social workers conduct formal risk assessments for all children under the age of five in order to "determine the harm to the child, the ability of the caregivers to provide a safe home, and the departmental response required to ensure the child's safety[; t]his includes an analysis of substance abuse and domestic violence in the home."[33] FOF Nos. 232-33 (internal quotation marks, citation to the transcript and trial exhibit omitted). To this end, DHS's social workers are mandated to document the risk assessment via a "Child Risk Assessment Summary" and a "Family Safety Assessment" matrix forms. Green Book at  1.2.2(H). The completion of matrix forms are specifically required prior to reunifying a child with a parent suspected of child abuse in order to determine the existing and foreseeable risk levels of harm to the child in the home.[34] Green Book at  2.2.3(A)(5).
Moreover, to ensure that a report of suspected child abuse is promptly investigated, DHS "shall make a clear decision whether abuse, neglect, or exploitation did or will occur" within "sixty days of the date of report[.]" HAR  17-920.1-16 (emphasis added). Consequently, DHS "shall":
(1) Resolve the matter in an informal fashion appropriate under the circumstances;
(2) Seek to enter into a service plan, without filing a petition in court, with members of the child's family and other authorized agency as the department deems necessary to the success of the service plan, including but not limited to, the member or members of the child's family who have legal custody of the child . . . ;
(3) Assume temporary foster custody of the child pursuant to section 587-24(a) . . .; or
(4) File a petition . . . in court under this chapter.
HRS  587-21(b).
Based upon the above statutory and regulatory mandates, the legislature ÔÇö in our view ÔÇö has created a duty flowing to children specifically identified to DHS as being the subject of suspected abuse. In other words, DHS is obligated to protect that specific class of children from a specific kind of harm that will likely continue if the statutory duty is ignored. DHS is given not just a specific duty to act in response to such a report but ample and detailed authority to do so.
There can be no dispute that the relevant statutory provisions, along with its administrative rules and policies, create a duty on *567 the part of DHS to assist a particular class of persons to which Minor belongs and to prevent the type of harm suffered by Minor. See Restatement (Second) of Torts  286 (1965) (courts may adopt, as standard of conduct, requirements of statutes "whose purpose is found to be exclusively or in part . . . to protect a class of persons which includes the one whose interest is invaded"). The plain language of Chapter 587, read in conjunction with its purpose, clearly demonstrates the legislature's intention that DHS and its social workers act immediately when specific reports of abuse or neglect are received. The call for immediate action necessarily requires intervention by DHS and its social workers in situations involving non-custodial individuals such as Minor. See 38 Am.Jur. Trials 1  9 (1989) (stating that "social workers[, among others,] are regarded as the first line of defense in the war against child abuse because they are most likely to come in contact with maltreated children when symptoms of abuse, neglect, or molestation are most apparent"). Indeed, one of the decisions required to be made by DHS is whether to file a petition with the court to obtain legal and physical custody of the minor. HRS  587-21(4). Obviously, DHS would not intervene in a case of abuse or neglect of which it has no knowledge. However, the legislature's call for immediate action once such a report is received underscores the recognition of a special relationship between DHS and the alleged endangered child and a duty on the part of DHS and its social workers to protect that child.
Accordingly, we conclude that DHS had a duty to protect Minor under the circumstances of this case. In so concluding, we join several courts in other jurisdictions with a similar statutory scheme as Hawaii's that have imposed a statutory duty upon state social services agencies to assist and protect abused children. As previously mentioned, the Sabia court concluded that the SRS has a duty to protect the plaintiffs from further abuse, explaining that Vermont's
statutory law provides that (1) SRS "shall cause an investigation to commence within seventy-two hours after receipt of a report" of child abuse, 33 V.S.A.  4915(a) (emphasis added); (2) the investigation "shall include" a visit to the child's home and an interview with, or observation of, the child, and shall seek to determine, among other things, the identity of the abuser and the immediate and long-term risk if the child remains in the existing home, id.  4915(b) (emphasis added); and (3) if the investigation produces evidence of abuse or neglect, SRS "shall cause assistance to be provided to the child and his family in accordance with a written plan of treatment." Id.  4915(c) (emphas[e]s added). Further, the stated purposes of the provisions requiring SRS to investigate reports of child abuse and render appropriate services are to "protect children whose health and welfare may be adversely affected through abuse or neglect," to "strengthen the family and make the home safe for children," and to "provide a temporary or permanent nurturing and safe environment for children when necessary." 33 V.S.A.  4911. Thus, it is beyond dispute that the relevant statutory provisions create a duty on the part of SRS to assist a particular class of persons to which plaintiffs belong and to prevent the type of harm suffered by plaintiffs.
669 A.2d at 1191-92. In Horridge v. St. Mary's County Department of Social Services, 382 Md. 170, 854 A.2d 1232 (2004), the Maryland Court of Appeals also found a statutory obligation on the part of Maryland's equivalent of Hawaii's DHS ÔÇö the Department of Social Services (DSS) ÔÇö to conduct a thorough investigation and take appropriate steps to protect a child who is the subject of a report of abuse and succinctly held that:
The duties imposed on DSS by [the Maryland Family Law  5-706 (relating to investigation of child abuse report) ] and the implementing regulations . . . are far more specific and focused. They require a prompt investigation of each reported incident of child abuse. The duty to act is mandatory; the steps to be taken are clearly delineated; and, most important, the statute makes clear in several places that the sole and specific objective of the requirement is the protection of a specific class of children ÔÇö those identified in or identifiably from specific reports made to *568 DSS and those also found in the home or in the care or custody of the alleged abuser. This is not an obligation that runs to everyone in general and no one in particular. It runs to an identified or identifiable child or discrete group of children.

Id. at 1243 (emphasis added) (original emphasis omitted). In Brodie v. Summit County Children Services Board, 51 Ohio St.3d 112, 554 N.E.2d 1301 (1990), suit was brought against Ohio's equivalent of Hawaii's DHS (Summit County Children Services Board (CSB)) for failure to investigate reports of child abuse. Id. at 1303. The Ohio Supreme Court was confronted with the issue whether the statutory obligation embodied in Ohio Revised Code (R.C.)  2151.421 (relating to procedures upon receipt of report) created any duty to protect a specific child. Id. at 1307-08. The court concluded that, "in view of the General Assembly's express intent that children services agencies take responsibility for investigating and proceeding with appropriate action to prevent further child abuse or neglect in specific, individual cases," CSB had "a duty to investigate and report their findings as required by R.C.  2151.421 when a specific child is identified as abused or neglected[.]" Id. at 1308; see Mammo v. State, 138 Ariz. 528, 675 P.2d 1347, 1351 (Ct.App.1983) (duty arose where the statute "is quite specific and sets forth duties on the part of protective services workers which are clearly for the protection of threatened individuals"); Turner v. Dist. of Columbia, 532 A.2d 662, 668 (D.C.1987) (holding that "[t]he Child Abuse Prevention Act imposes upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise helpless class of persons: abuse and neglected children"); Dep't of Health & Rehabilitative Servs. v. Yamuni, 529 So.2d 258, 261-62 (Fla. 1988) (statute requiring social services agency to provide assistance to children following specific reports of abuse created legal duty); Jensen v. Anderson County Dep't of Soc. Servs., 304 S.C. 195, 403 S.E.2d 615, 619 (1991) (finding a statutory duty upon the state social services agency because "the purpose of the child abuse statutes is to provide protection for children from being abused" and the "statutes mandate investigation and intervention to remove endangered children when abuse has been reported"); see also Coleman v. Cooper, 89 N.C.App. 188, 366 S.E.2d 2, 8 (1988) (violation of statute requiring social services agency to provide assistance to abused children following reports of abuse gave rise to action for negligence when agency was aware that children had suffered sexual abuse), overruled in part on other grounds by Meyer v. Walls, 347 N.C. 97, 489 S.E.2d 880 (1997).[35]
*569 2. Breach of the Standard of Care
As previously stated, the trial court
determined that the standard of care applicable to DHS in the current context is a professional judgment standard. In Youngberg v. Romeo, [457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982),] the [United States Supreme C]ourt held that the proper standard for determining whether a [s]tate adequately protected the rights of an individual who had been committed to the care of a state institution is a "professional judgment" standard. [Id. at] 313-14[, 102 S.Ct. 2452]. The Youngberg standard applies in this case even though DHS refrained from obtaining legal custody over [Minor].
COL No. 31 (emphasis added).
In Youngberg, Nicholas Romeo, a profoundly retarded individual, was admitted to a state mental facility on a permanent basis. 457 U.S. at 309-10, 102 S.Ct. 2452. Romeo was admitted at the request of his mother (the plaintiff), who petitioned the Philadelphia County Court of Common Pleas, because she was unable to care for him or control his violent behavior. Id. at 309, 102 S.Ct. 2452. Thereafter, the plaintiff, on behalf of Romeo, filed a complaint, alleging that the administrators of the state institution (the defendants) failed to provide adequate care to Romeo, in violation of his Eighth and Fourteenth Amendment to the United States Constitution. Id. at 310, 102 S.Ct. 2452. The district court instructed the jury that it could find the defendants liable only if the defendants showed deliberate indifference to Romeo's serious mental needs. Id. at 312, 102 S.Ct. 2452. A verdict was returned in favor of the defendants. Id.
On appeal, the United States Court of Appeals for the Third Circuit, sitting en banc, reversed the verdict, holding that
the Eighth Amendment [to the United States Constitution], prohibiting cruel and unusual punishment of those convicted of crimes, was not an appropriate source for determining the rights of the involuntarily committed. Rather, the Fourteenth Amendment and the liberty interest protected by that Amendment provided the proper constitutional basis for these rights. In applying the Fourteenth Amendment, [the Third Circuit Court] found that the involuntarily committed retain liberty interests in freedom of movement and in personal security. These were "fundamental liberties" that can be limited only by an "overriding, non-punitive" state interest.
Id. at 312-13, 102 S.Ct. 2452 (citation omitted). The Third Circuit Court,
did not, however, agree on the relevant standard to be used in determining whether Romeo's rights had been violated. . . . [T]he majority held that when treatment has been administered, those responsible are liable only if the treatment is not acceptable in the light of present medical or other scientific knowledge.
Chief Judge Seitz, concurring in the judgment, . . . concluded that the appropriate standard was whether the defendants' conduct was such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to *570 demonstrate that the defendants did not based their conduct on a professional judgment.
Id. at 313-14, 102 S.Ct. 2452 (bold emphasis added) (internal quotation marks, citations, and footnote omitted).
In granting the petition for a writ of certiorari, the Supreme Court initially observed that, generally, a state is under no constitutional duty to provide substantive services to individuals; however, "[w]hen a person is institutionalized ÔÇö and wholly dependent on the State ÔÇö . . . a duty to provide certain services and care does exist." Id. at 317, 102 S.Ct. 2452. The Court then concluded, as did Chief Judge Seitz, that the appropriate standard in determining whether a substantive due process right has been violated in the context of those who have been involuntarily committed was the "professional judgment" standard. Id. at 322-23, 102 S.Ct. 2452. Under the standard, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 321, 102 S.Ct. 2452. The standard acknowledges "that courts must show deference to the judgment exercised by a qualified professional," id. at 322, 102 S.Ct. 2452, and that,

the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

Id. at 323, 102 S.Ct. 2452 (emphases added) (footnotes omitted).
DHS contends that, although it does not challenge the trial court's conclusion that the standard enunciated in Youngberg applies, DHS believes that the trial court erred in its legal interpretation of the requirements of the Youngberg "professional judgment" standard of care. According to DHS, the trial court's misinterpretation resulted in its application of "a higher standard of care than proper to determine whether DHS breached a duty." Specifically, DHS argues:
Under the discretionary Youngberg standard, the professional's own judgment is key. The court must defer to the professional's discretion. Here, the [trial] court erred by not giving due consideration to [Ms.] Brewerton's own testimony. . . .
Ms. Brewerton conducted a professional investigation pursuant to HRS  587-21 ("the department shall cause such investigation to be made as it deems appropriate"). She participated in a joint investigation with [Lieutenant] Yamashita. Id. ("In conducting an investigation[,] the department may . . . enlist the cooperation of appropriate law enforcement authorities"). She interviewed [Minor] alone. Id. ("In conducting the investigation[,] the department may . . . interview a child who is the subject of an investigation without the prior approval of and without the presence of the child's family"). In addition, she also interviewed Dr. Kepler, Dr. Dixon, Denise, and Daryl. She supported resumption of the family court's joint custody order because she understood that neither Dr. Kepler nor Jarrett believed that Denise had harmed [Minor]. She agreed that an MDT review of this case was necessary, and fully cooperated with the review process. . . .
[Ms.] Brewerton also properly exercised her professional judgment in implementing a verbal [i.e., an oral] safety plan with Denise. HRS  587-21 ("Upon satisfying itself as to the course of action that should be pursued to best accord with the purpose of this chapter, the department shall . . . resolve the matter in an informal fashion appropriate under the circumstances."). [Ms.] Brewerton's plan specified that Denise would not bring [Minor] to Daryl's house, or leave [Minor] alone with Daryl for any length of time. . . . [Ms.] Brewerton, in her professional estimation, believed Denise to be a genuine and credible person. She based that determination on her education and experience, as well as her prior interaction with Denise, and on her understanding that Dr. Kepler and Jarrett trusted Denise. She had no reason *571 to suspect that Denise would violate the terms of her agreement.
(Emphases in original.)
The Kaho`ohanohanos, on the other hand, believe that, although the trial court specifically referenced the Youngberg professional judgment standard, it did not actually apply it, but, that it applied, instead, the reasonable care standard. In support of their contention, the Kaho`ohanohanos point out that, at trial, the trial court expressly indicated that the appropriate standard of care by which DHS would be judged was a duty to exercise or use reasonable care.
As observed by the Kaho`ohanohanos, the trial court orally stated that the "reasonable person" standard of care applied to this case. The trial court announced that:
In exercising its professional judgment[,] did the [CPS] or its staff exercise a degree of learning, skill and experience expected of a reasonable child protective services agency operating pursuant to the relevant criteria that are set out in Chapter 587 and the corresponding administrative rules and any relevant national standards which the experts may speak to here.

If [DHS] did not exercise such degree of learning, skill and experience, was that failure then a substantial factor in causing the harm to the [Kaho`ohanohanos]. I think we are dealing with here basically still ÔÇö and I don't believe ÔÇö I think there is some misperception [sic] that somehow in the [Kaho`ohanohanos'] mind that thisÔÇö what the court has indicated a professional standard, a professional judgment, if you will, is some higher standard than is ordinarily adopted by Hawai`i courts when dealing with negligence cases. In the court's mind[,] it is not.
We are dealing here with people who have specialized knowledge, the social workers who have testified. Both the supervisor and M[s.] Brewerton have specialized knowledge which the average person does not have. They are professionals and they are going to be held to the same standard of care as other professionals who practice in their profession who operate in [CPS].
. . . The burden is on the [Kaho`ohanohanos] to prove by a preponderance of the evidence that in exercising its professional judgment the CPS unit . . . somehow did not exercise the appropriate level . . . learning, skill and experience of a reasonable [CPS] agency in protecting . . . the safety of the child.

 . . . The issue is whether they exercised reasonable care given the special expertise which they have so I don't think we are dealing here with a higher standard of care.
(Emphases added.) The trial court further clarified that "this professional judgment standard is [not] any different than the standard we would apply to any professional in any field here in the State of Hawai'i." (Emphasis added.)
However, notwithstanding the foregoing oral announcement, the trial court, in its first amended trial order, expressly concluded that the "Youngberg standard applies to this case even though DHS refrained from obtaining legal custody." COL No. 31. The trial court also concluded that:
32. In applying the professional judgment standard, this court must "make certain that professional judgment in fact was exercised. . . . It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." [Youngberg, 457 U.S.] at 322[, 102 S.Ct. 2452] (internal quotation [marks] and citations omitted). The court must initially defer to the judgment exercised by a qualified professional assuming that appropriate relevant professional standards are met. Id. at 322-23[, 102 S.Ct. 2452].
33. However, liability may be imposed when a decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323[, 102 S.Ct. 2452]. If DHS's decisions represented a substantial departure, the question becomes whether such a violation of the standard of care was a *572 substantial factor in causing [Minor]'s injuries.
COL Nos. 32-33 (footnote omitted).
Based on the foregoing positions of the parties, we first address (1) whether the Youngberg standard is applicable in this case and, if not, (2) what is the applicable standard, and (3) whether the standard actually applied by the trial court in reaching its conclusions was erroneous.
a. applicability of the Youngberg standard of care
As previously described, Youngberg involved a civil rights action raising constitutional issues of substantive due process rights. As observed by the Supreme Court, "[w]hen a person is institutionalized ÔÇö and wholly dependent on the StateÔÇö . . . a duty to provide certain services and care does exist." Youngberg, 457 U.S. at 317, 102 S.Ct. 2452. The Court then concluded that the appropriate standard in determining whether a substantive due process right has been violated in the context of those who have been involuntarily committed was the "professional judgment" standard. Id. at 322-23, 102 S.Ct. 2452. Youngberg, however, is distinguishable and inapposite to the instant case. Here, the Kaho`ohanohanos do not assert any violation of constitutional proportions; their claims are grounded in common law principles of negligence. Moreover, this is not a case of involuntary commitment or custodial care; it is a case involving allegations against DHS for its improper investigation and failure to protect abuse victims from future harm, i.e., negligence. As such, there exists a well-established standard of care for negligence actions in this jurisdiction, discussed infra. Accordingly, we hold that the trial court erred to the extent that it believed the Youngberg professional judgment standard applied in this case.[36] We now turn to examine what is the applicable standard of care in negligence cases.
b. the applicable standard of care in this case
This court has previously stated that, in a negligence action:
Whether there was a breach of duty or not, i.e., whether there was a failure on the defendant's part to exercise reasonable care, is a question for the trier of fact. Generally, the defendant's conduct is measured against what a reasonable and prudent person would have done under the circumstances in determining whether there has been a breach of a duty of care owed to the plaintiff. However, the conduct of the mythical reasonable and prudent person will vary with the situation with which he or she is confronted because what is reasonable and prudent in the particular circumstances is marked out by the foreseeable range of danger.
Doe Parents No. 1, 100 Hawai`i at 82, 58 P.3d at 593 (emphases added) (internal quotation marks, citations, ellipsis, and original brackets omitted); see also Upchurch v. State, 51 Haw. 150, 152, 454 P.2d 112, 114 (1969) ("[W]hen the State fails to exercise ordinary care, a standard of care required of a reasonably prudent person, it becomes liable under the [STLA] unless exempted.").
Moreover, the established standard of care for all professionals is to use the same degree of skill, knowledge, and experience as an ordinarily careful professional would exercise under similar circumstances. See, e.g., Exotics Hawaii-Kona, Inc. v. E.I. Du Pont de Nemours & Co., 116 Hawai`i 277, 300, 172 P.3d 1021, 1044 (2007) [hereinafter, Exotics Hawaii-Kona II] (stating that, in medical malpractice actions, expert opinion is generally required to determine the "degree of skill, knowledge, and experience required of the physician, and the breach of the medical standard of care"); Craft v. Peebles, 78 Hawai`i 287, 298, 893 P.2d 138, 149 (1995) ("in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care") (citation omitted); Restatement (Second) of Torts  299A (1965) ("Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required *573 to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities."). Nevertheless, although professional conduct is measured against a professional standard, all persons, including professionals, are also obligated, generally, to exercise due care or ordinary care, commensurate with the apparent risk. See W. Page Keeton, Prosser & Keeton on the Law of Torts  32, at 185 (5th ed.1984) ("[p]rofessional persons in general, and those who undertake any work calling for special skill, are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability") (footnote omitted). As discussed above, "a standard of conduct may be determined by reference to a statute." Ono v. Applegate, 62 Haw. 131, 137, 612 P.2d 533, 539 (1980). As cited by the Ono court with approval, the Restatement (Second) of Torts  285 (1965) provides that:
The standard of conduct of a reasonable man may be
(a) established by a legislative enactment or administrative regulation which so provides, or
(b) adopted by the court from a legislative enactment or an administrative regulation which does not so provide, or
(c) established by judicial decision, or
(d) applied to the facts of the case by the trial judge or the jury, if there is no such enactment, regulation, or decision.
Id. at 137-138, 612, 612 P.2d at 539 (emphasis added). Comment c to this section provides in relevant part that:

Even where a legislative enactment contains no express provision that its violation shall result in tort liability, and no implication to that effect, the court may, and in certain types of cases customarily will, adopt the requirements of the enactment as the standard of conduct necessary to avoid liability for negligence[.]
Id. at 138, 612 P.2d at 539 (emphases added). Thus, the inquiry is whether DHS's social worker, Ms. Brewerton, failed to exercise the level of requisite skill, knowledge, and experience ordinarily used by members of her profession in meeting the standard of care established by HRS chapter 587, the HAR, and DHS's Green Book. Exotics Hawaii-Kona II, 116 Hawai`i at 300, 172 P.3d at 1044. Accordingly, the applicable standard of care in this case, i.e., a negligence case, is the well-established reasonable person standard of care, as elaborated above. We finally turn to the trial court's decision to determine whether, as the Kaho`ohanohanos so contend, the reasonable person standard of care was in fact applied (irrespective of the trial court's pronouncement that the Youngberg standard was applicable).
c. the correctness of the trial court's decision
We begin with the trial court's undisputed FOFs,[37] particularly, those pertaining to the standard of care. The trial court found the Kaho`ohanohano's witness, Marianne Berry, Ph.D. (Dr. Berry), who was qualified as an expert in the field of child protective services, credible. FOF No. 223. Based on Dr. Berry's testimony at trial, the trial court entered the following FOFs:
224. [T]he standards in HRS chapter 587, HRS chapter 350, the [HAR], and *574 DHS's "Green Book" meet the national consensus and standards.
225. The DHS "Green Book" provides that risk assessment matrices must be completed prior to reunification. There was no evidence that a . . . risk assessment was done prior to DHS deciding that Denise should resume custody of [Minor].
226. After a report of suspected child abuse, DHS had two primary responsibilities: to protect the child from further abuse and to conduct a complete, thorough and timely investigation within 60 days of the report. By the time of the April 16 incident, DHS had not made any disposition with regard to the February incident. Dr. Berry opined that the lack of a disposition did not meet the "[professional] judgment standard of practice."
227. Dr. Berry described an actuarial risk assessment matrix that DHS uses to assess the level of harm to a child. . . . The matrix is used to ensure that social workers make systematic and consistent decisions, to increase objectivity and professionalism of their decisions and to ensure that those decisions are made by professionals using sound actuarial tools, because child welfare is a highly volatile and emotional field. This matrix assesses the vulnerability of a child, the risk to a child, the caretakers, and the environment of the child. The assessment process that Hawai`i follows meets national standards.
228. According to Berry, once the initial risk assessment is completed, the risk assessment should then be used as a working document, by which a social worker should track and guide the remaining risk factors to a child to assess the level of risk to the child. Ms. Brewerton did not do so.
. . . .
237. Dr. Berry testified that Ms. Brewerton's reliance on Denise's willingness to take a polygraph exam did not meet the professional judgment standard because that willingness did not negate other factors.
238. According to Dr. Berry, the national consensus of child protective practice is to determine whether the threat of harm to a child has been reduced and whether the child will be safe. Dr. Berry opined that Ms. Brewerton's decision on February 28, 2001 to permit Denise to resume caring for [Minor] did not meet the standard of care because there was no documentation that the risk had been reduced, it was undisputed that the fracture occurred in Denise's custody, and there was no new evidence that Denise was able to protect [Minor].
. . . .
240. Dr. Berry found four areas where DHS committed errors after the February 14 injury: (1) the release of [Minor] into Denise's care; (2) inadequate investigation; (3) an insufficient service agreement; and (4) overreliance on subjective beliefs at the expense of objective facts.
241. Dr. Berry testified that the service agreement was insufficient, in part, because it was not in writing, although a written safety plan is required by Chapter 587.
. . . .
248. Moreover, Dr. Berry testified the agreement was insufficient because it was below the professional judgment standard for DHS to expect that Denise would comply with its request that she not take [Minor] to Daryl's house.
249. Dr. Berry further testified that DHS's investigation of [Minor]'s femur fracture was below the standard of care and practice because the investigation was not thorough and complete.

FOF Nos. 224-28, 237-38, 240-41, 248-49 (emphases added) (internal quotation marks and citations to the transcripts omitted).
*575 DHS called Margaret Smith, Ph.D. (Dr. Smith) as its expert to testify in the field of social welfare and child protective services. The trial court found Dr. Smith's testimony not credible ÔÇö particularly, with respect to her opinion that the risk assessment matrix "is a very poor predictor of future harm." FOF No. 229 (citation to the transcript omitted). With regard to Dr. Smith's testimony, the trial court found:
242. [P]utting agreements such as safety plans in writing can indicate distrust of the person involved. Ms. Gnehm-Wright further testified that she does not put agreements in writing because it is disrespectful and is a "haole" thing to do.
243. The credibility of Dr. Smith and Ms. Gnehm-Wright was adversely affected when Dr. Smith disclosed that she did additional work in the case consisting of re-interviewing Ms. Brewerton and Ms. Gnehm-Wright on May 26, 2006 ÔÇö after trial already began in this case ÔÇö for five hours. This meeting with Ms. Brewerton and Ms. Gnehm-Wright occurred after Plaintiffs conducted a second deposition of Dr. Smith because the State did not timely disclose Dr. Smith's written report to Plaintiffs.
244. While Dr. Smith initially stated at trial that she had left her personal notes of the group interview in Seattle, Washington[ ] and that no one would be able to locate them, she produced four pages of handwritten notes of the group interview after a recess. After further questioning by the [c]ourt, Dr. Smith produced an additional 13 pages of original notes.
245. These notes revealed a number of statements and references that the [c]ourt construes as an attempt by Dr. Smith and the other witnesses to coordinate their testimony during the five-hour meeting. For example, [p]age 2 of her notes refers to "minimize inconsistencies," "professional judgment," "Ruby [being] part of the [safety] plan," "parenting guy," "marriage first being brought up at the MDT," "Orian's polygraph exam," "allowing [Minor] to remain with Denise," "the absence of a written safety plan," "[Minor]'s premature return," "risk assessment matrices," and "unconfirming abuse." These matters were testified to by Dr. Smith, Ms. Brewerton[,] and Ms. Gnehm-Wright.
246. In addition, Dr. Smith admitted that she had another previously undisclosed two-hour meeting on June 4, 2006, with counsel for DHS John Cregor, Esq. and Ms. Gnehm-Wright. June 4 was the day before Ms. Gnehm-Wright was to resume the stand and continue testifying at trial. Thus, the court finds that the testimony of Dr. Smith and Ms. Gnehm-Wright was not credible unless otherwise noted above.
FOF Nos. 242-46 (internal quotation marks and citations to transcripts and trial exhibits).
Based upon the above FOFs, the trial court concluded:
36. After February 14, 2001, the DHS's primary responsibility was to exercise reasonable professional judgment to protect [Minor] from further abuse and to conduct a complete, thorough, and timely investigation within 60 days of the report of abuse. Sixty days from the report on February 15 was April 16, 2001 ÔÇö the day [Minor] was brought into the hospital with massive and life-threatening injuries. DHS made no disposition confirming or unconfirming abuse by this date.
37. DHS conducted an inadequate investigation. DHS failed to identify the perpetrator of the abuse ÔÇö in fact, Ms. Brewerton and/or the DHS has still not identified the perpetrator or perpetrators of the harm inflicted on February 14, 2001 and the perpetrator of the harm inflicted on or about April 16, 2001. Prior to April 16, Ms. Brewerton did not investigate reports of cigarette burns, bruises, and other marks on [Minor] that were indicative *576 of abuse. Prior to April 16, DHS did not confer with each of the physicians who had treated the child and who had firmly concluded that the femur fracture was the result of abuse.
38. Ms. Brewerton's actions demonstrated over-reliance on subjective impressions relative to Denise's trustworthiness and judgment as opposed to an objective risk-based assessment of the potential harm to the child. Ms. Brewerton's reliance on Denise's willingness to take a polygraph exam as the criterion for renewing physical custody did not meet the professional judgment standard, as that willingness did not negate other factors indicative of threatened harm to [Minor].
39. The verbal service agreement in this case fell below the standard of care. The agreement did not protect [Minor] from potential further harm. Daryl, the prime suspected perpetrator, continued to have access to [Minor] through April 16. The agreement was limited to Denise promising not to take [Minor] to Daryl's home. This agreement was indicative of Ms. Brewerton's misplaced and unfounded belief that [Minor] suffered her injuries as a result of an accident that occurred in a physically unsafe location. Ms. Brewerton focused her efforts on the physical safety of the home, rather than on [Minor]'s safety in the presence of potentially abusive individuals. It has still never been determined that any of the injuries occurred in the home of Daryl. The only determinations are the injuries occurred when [Minor] was in the presence of Daryl and Denise.
40. Moreover, the fact that the agreement was not in writing did not comport with DHS's policies and the statutory requirements. Under [HRS c]hapter 587 . . ., safety plans are required to be in writing and should explicitly state what the agreement is and what people will and will not do, lay out what the consequences for breaching the agreement and be signed by all the parties. This was not done in this case. Ms. Gnehm-Wright's and Ms. Brewerton's belief that written agreements tend to make certain "local" people defensive or less cooperative is an inadequate excuse to avoid professional standards.

41. Furthermore, Ms. Brewerton and Ms. Gnehm-Wright's decision to rely on Denise's statement that she would not take [Minor] to Daryl's home fell below the professional judgment standard. Without some objective or psychological evaluation of Denise's personal strengths and weaknesses relative to personal relationships, the DHS should not have assumed that Denise was able to protect her child in the presence of Daryl, wherever he was located.
42. DHS's actions also fell below the standard of care in relation to the MDT process. DHS policy states that the MDT meeting should be held within ten days of the intake and that an MDT meeting must be held when a child suffers a fracture; however, here, the meeting was not held until over one month after the intake.

43. The role of an MDT is advisory. The ultimate decision regarding a case rests with the caseworker. The framing of the question for the MDT by Ms. Brewerton was negligently calculated to elicit a response which favored a finding of accidental harm. Although the MDT report concluded that [Minor]'s femur fracture was "probably" accidental, Ms. Brewerton did not exercise professional judgment in relying on the report since it was inconsistent with the medical opinion of every physician who had treated [Minor]. Prior to the meeting, Ms. Brewerton herself asked Dr. Briley to look for potential explanations for [Minor]'s injury other than abuse. Nonetheless, Dr. Briley ultimately concluded that the femur fracture was the result of abuse. Ms. Brewerton did not exercise professional judgment in relying on the *577 MDT report in the face of the substantial medical evidence to the contrary. Her failure to inform the MDT of the initial failed polygraph examinations of Denise is inexplicable.

44. While DHS's foremost obligation was to protect [Minor], the court was left with the distinct impression, based upon her testimony in court, that Ms. Brewerton's primary goal was the provision of services to maintain the unity of the family. Ms. Brewerton failed to complete a timely, thorough, and complete investigation by April 16, 2001. She also failed to protect [Minor]. . . .
COL Nos. 36-44 (emphases added).
Although the trial court erroneously declared that the Youngberg professional standard of care applied, the above conclusions demonstrate that the trial court actually applied the reasonable person standard of care. Apparently, the trial court believed (albeit, incorrectly) that the Youngberg professional judgment standard was not "some higher standard than is ordinarily adopted by Hawai`i courts when dealing with negligence cases." Its misunderstanding that the Youngberg standard "is [not] any different than the standard [it] would apply to any professional in any field," in a negligence case involving the conduct of professionals led the trial court to ultimately apply the correct reasonable person standard of care.
It is well-settled that this court "will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence," In re Jane Doe, 95 Hawai`i 183, 190, 20 P.3d 616, 623 (2001) (citations omitted), "especially the findings of an expert . . . dealing with a specialize field," Igawa v. Koa House Restaurant, 97 Hawai`i 402, 410, 38 P.3d 570, 578 (2001) (citation omitted). Therefore, this court will not pass upon Dr. Berry's, as well as Dr. Smith's, credibility. In that regard, we believe that, based upon the above credible testimony of Dr. Berry, as the trial court so found, in conjunction with the undisputed FOFs relating to Ms. Brewerton's failures to properly and timely complete the investigation into Minor's February 14, 2001 injury, the trial court correctly concluded that DHS ÔÇö through Ms. BrewertonÔÇö breached the duty to use the same degree of care, skill, and ability as an ordinarily careful professional in her field would exercise under similar circumstances. Accordingly, the trial court, although it erred in announcing the application of the Youngberg standard of care, properly applied the correct standard and ruled that DHS breached its duty to protect Minor.
3. Causation
In its first amended trial order, the trial court determined that the Kaho`ohanohanos
must also provide a reasonably close causal connection between DHS's actions and [Minor]'s April 16, 2001 injuries. After February 14, the question was whether future injury was reasonably foreseeable given the perpetrator had not been determined. [The Kaho`ohanohanos] have so established. Ms. Brewerton's willingness and rush to entrust care of [Minor] to Denise, complete disregard of the medical evidence, and lenient verbal service agreement have a significant causal connection to [Minor]'s injuries on April 16, 2001. [Minor] suffered those injuries while in Denise's care and custody. Had DHS taken custody away from Denise, required supervised visits, or had a more strict service agreement[,] it is highly likely that [Minor] would not have been injured.
COL No. 45. However, DHS maintains that the trial court's above conclusion is erroneous. Specifically, DHS contends that: (1) the trial court erred in collaterally estopping DHS from proving Minor's April 16, 2001 injuries occurred while she was in Jarrett's care[38]; and, (2) even if the trial court were *578 correct in its determination, the fact that Minor was in Denise's care at the time of the injuries, alone, did not establish that DHS's actions were the proximate or legal cause of Minor's injuries. We address each of DHS's contentions in turn.
a. collateral estoppel
Collateral estoppel is an aspect of res judicata which
precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies. Collateral estoppel also precludes relitigation of facts or issues previously determined when it is raised defensively by one not a party in a prior suit against one who was a party in that suit and who himself raised and litigated the fact or issue.
Dorrance v. Lee, 90 Hawai`i 143, 148, 976 P.2d 904, 909 (1999) (emphases in original) (ellipsis, original brackets, and citation omitted). To establish collateral estoppel and thereby bar the relitigation of the issue, four requirements must be met:
(1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom [collateral estoppel] is asserted was a party or in privity with a party to the prior adjudication.
Exotics Hawaii-Kona, Inc. v. E.I. DuPont De Nemours & Co., 104 Hawai`i 358, 365, 90 P.3d 250, 257 (2004) (emphasis added) (citation omitted) [hereinafter, Exotics Hawaii-Kona I].
As previously stated, the family court ÔÇö at the foster custody hearing on January 8, 2002 ÔÇö orally found that "the evidence as a whole shows that it is more probable than not that [Minor] was harmed while in the physical care of her mother, Denise," and "not that [Minor] was not harmed while in the physical care of her father[,] Jarrett[.]" The above finding was later adopted by the circuit court in granting the Kaho`ohanohanos' motion for partial summary judgment, discussed more fully infra.
DHS, however, believes that the circuit court erred in precluding it from introducing evidence as to the time and date when Minor sustained the injuries which led to this litigation on the basis of the family court's oral finding. Specifically, DHS, premising its argument on the second requirement of the collateral estoppel test, i.e., the existence of a final judgment on the merits, argues that "the family court's consideration of the issue did not result in a `final judgment on the merits.' The family court's oral ruling on the matter, which was never even reduced to writing, cannot be considered to constitute a final judgment." (Some emphases in original and some added.) (Citation omitted.)
Preliminarily and as previously stated, "[t]he rule in this jurisdiction prohibits an appellant from complaining for the first time on appeal of error to which he has acquiesced or to which he failed to object." Querubin v. Thronas, 107 Hawai`i 48, 61 n. 5, 109 P.3d 689, 702 n. 5 (2005) (internal quotation marks, citations and original ellipsis omitted); see also HRAP Rule 28(b)(4) ("Points not presented in accordance with this section will be disregarded[.]"). We believe, based on our review of the record, that DHS failed to properly preserve its specific argument concerning the existence of a final judgment on the merits for purposes of appeal; however, assuming arguendo that the issue was properly preserved, DHS's contention would, nevertheless, fail.
The family court's record of the foster custody proceedings was not made part of the record on appeal in the instant case; only portions of the custody proceedings ÔÇö i.e., transcripts ÔÇö were appended as exhibits to the Kaho`ohanohanos' motion for partial summary judgment and DHS's memorandum in opposition thereto. Thus, the existence or non-existence of a written order or judgment awarding custody cannot be confirmed. However, a reasonable inference can be drawn that DHS is correct, that is, no written order or judgment was filed because, if one had been entered, surely the Kaho`ohanohanos *579 would have been the first to point it out. Rather, in arguing that the second prong of the collateral estoppel test has been met, the Kaho`ohanohanos apparently took great care in asserting that "the [f]amily [c]ourt's decision was final and not appealed by any party," without indicating one way or the other whether "there is a final judgment on the merits." Exotics Hawaii-Kona I, 104 Hawai`i at 365, 90 P.3d at 257 (citation omitted).
This court has observed that "[t]he very nature of a family court chapter 587 proceedings entails an ongoing case which does not result in a `final' order, as that term is generally defined." In re Doe Children, 105 Hawai`i 38, 54, 93 P.3d 1145, 1161 (2004) (internal quotation marks omitted and citation omitted). For example, Hawai`i Family Court Rules (HFCR) Rule 52(a) (2007) provides in relevant part that:
In all actions tried in the family court, the court may find the facts and state its conclusion of law thereon or may announce or write and file its decision and direct the entry of the appropriate judgment; except upon notice of appeal filed with the court, the court shall enter its findings of fact and conclusions of law where none have been entered, unless the written decision of the court contains findings of fact and conclusions of law.
(Emphases added.) Cf. HRCP 52(a) (2007) ("In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusion of law thereon, and judgment shall be entered pursuant to Rule 58" (2007) (entry of judgment)); see In re Estate of Rogers, 103 Hawai`i 275, 282-83, 81 P.3d 1190, 1197-98 (2003) (observing that "the term `may' . . . is permissive" and not mandatory). In other words, the family court is not required to enter written findings of fact and conclusions of law unless a notice of appeal has been filed, in which case, the family court is required to do so. See Mark v. Mark, 9 Haw.App. 184, 192, 828 P.2d 1291, 1296 (1992) ("[i]n cases where a notice of appeal has not been filed, the family court may [ÔÇöis under no obligation to do soÔÇö] enter findings of fact and conclusions of law") (emphasis added). In that regard, the family court is unique; however, the discretion afforded to family court judges under HFCR Rule 52(a) to render rulings orally or in writing does not negate the finality of those rulings. See In Interest of Doe, 77 Hawai`i 109, 114, 883 P.2d 30, 35 (1994) (concluding that a family court's determination of exclusive jurisdiction over a child and award of foster custody to DHS was an appealable decision because it met the degree of "finality" required for appeal and a family court's exercise of continuing jurisdiction over a child does not defeat a right to appeal). Accordingly, the fact that the family court's oral ruling was presumably never reduced to writing is not necessarily fatal and does not render the oral ruling itself not final for purposes of the current collateral estoppel analysis. Given the ongoing jurisdiction of the family court, the ongoing nature of Chapter 587 proceedings, and the fact that DHS does not challenge the finality of the award of custody of the Minor to Jarrett, the family court's oral findings, conclusion, and decision regarding issues related to Minor's custody was "a final judgment on the merits." Exotics Hawaii-Kona I, 104 Hawai`i at 365, 90 P.3d at 257 (citation omitted); cf. In Interest of Doe, 77 Hawai`i at 114 n. 9, 883 P.2d at 35 n. 9 (noting that, "due to the nature of a `final' judgment in child custody cases, the requirements for appealability set forth in Jenkins v. Cades Schutte Fleming & Wright, 76 Hawai`i 115, 869 P.2d 1334 [(1994)], are inapplicable in such custody cases").
Nevertheless, DHS contends that, even if the Kaho`ohanohanos could prove each element of collateral estoppel, the doctrine still would not apply because:
Collateral estoppel is an equitable doctrine, and there are exceptions to its application[.]
Although an issue is actually litigated and determined by a valid and final judgment, and the
determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

*580 (5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, . . . or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain full and fair adjudication in the initial action.

Restatement (Second) of Judgments  28 (1982) (emphases added).
Relying upon the above principles articulated in section 28 of the Restatement, DHS contends that it
had a totally different incentive in litigating the family court matter. In family court, DHS's sole focus was on the best interests of the child in parental custody proceedings, and thus DHS had no incentive to prove (or dispute) that a particular parent had custody when [Minor] was injured. Because DHS had no incentive to prove in family court that [Minor] was injured in Jarrett's (as opposed to Denise's) care, application of collateral estoppel in this case defeats the doctrine's purpose and would be manifestly unfair.
Moreover, applying collateral estoppel here would contravene public policy. Applying it here would have given the State an incentive in the family court proceedings to blame someone other than the mother in order to avoid subsequent liability, rather than encouraging the court to determine which parent was unsafe.
(Citations omitted.) (Emphasis in original.)
Although not specifically argued by the Kaho`ohanohanos, DHS's contention defies common sense. DHS claims that its "sole focus was on the best interests of the child in parental custody proceedings" and that it had "no incentive to prove . . . that [Minor] was injured in Jarrett's (as opposed to Denise's) care[.]" The whole purpose of the family court hearing was to determine Minor's custody. Surely, "the best interest of the child" would not have been served by placing her with the same parent in whose care she had been when she sustained her life-threatening injuries. Although DHS may not have had an incentive to specifically prove that Minor's injuries were sustained while in Jarrett's or even Denise's custody, a suspicion that such injuries were sustained while Minor was in either parent's custody would impact the assessment of what would be in the Minor's best interest. Thus, DHS, by its own argument, unwittingly acknowledges that a determination of which parent is safe or unsafe is an integral part of the decision as to what is in "the best interest of the child." Indeed, as the Kaho`ohanohanos point out, DHS admitted to the trial court that it had a "vested interest" in making sure the family court made the correct decision because a wrong determination would have returned Minor to the non-protective parent in whose custody the injuries occurred.
Furthermore, DHS appears to argue that it was not sufficiently foreseeable at the time of the foster custody hearing that the issue of the timing of Minor's near fatal internal injuries would conceivably arise in the context of a subsequent action. In this regard, we agree with the trial court's statements in its order denying DHS's motion for reconsideration that:
First, DHS had the benefit of reviewing the initial report of the [GAL] approximately four months prior to the contested [f]amily [c]ourt hearing. That report stated, ". . . DHS Maui Branch appears to have been grossly negligent in not filing a Petition in the Interest of [Minor] after the fracture of her left femur on or about February 14, 2001."
Second, as previously indicated, the [p]etition filed by DHS acknowledged that the timing of the subsequent injuries and the perpetrators of the injuries were unknown, and that DHS itself sought findings thereon. For DHS to now claim that it did not have notice that these were significant issues is without merit.
(Numbering omitted.) Accordingly, we are not persuaded that the concern raised by DHS is sufficient to overcome the policies underlying the doctrine of collateral estoppel, i.e., the public's reliance upon judicial pronouncements and the elimination (or, at least, reduction) of vexation and expense to the *581 parties, wasted use of judicial resources, and inconsistent results. See Exotics Hawaii-Kona I, 104 Hawai`i at 365, 90 P.3d at 257.
In a final attempt to persuade this court to permit it to litigate the issue regarding Minor's custody at the time of the April 16, 2001 injuries, DHS argues that "[t]he record reflects that DHS made several offers of proof that [Minor]'s injuries were inflicted at least three days prior to her hospitalization[,]" i.e., while in Jarrett's care. (Emphasis in original.) In support of its contention, DHS directs this court's attention to appendix A, entitled "Offer of Proof," attached to its motion for reconsideration. Briefly stated, in the Offer of Proof, DHS maintained that Enid Gilbert-Barness, M.D. (Dr. Gilbert-Barness), a pediatric pathologist, initially opined that the injuries were three or four days prior to the surgery, but later changed her opinion to forty-eight hours allegedly because of the GAL's request.[39] In support of its claim, DHS attached as an exhibit Dr. Gilbert-Barness' report that she did not understand the "enormous significance" of the changes she made in her opinions as it related to the timing of Minor's injuries. However, in light of the trial court's denial of DHS's motion for reconsideration, it appears that the trial court implicitly rejected DHS's contention. As the Kaho`ohanohanos pointed out in its memorandum in opposition to the motion for reconsideration, DHS's allegations are without merit because:
A senior medical examiner from Florida, Dr. Sam Gulino, also provided a written report to Dr. Thompson that it was his opinion that [Minor]'s injury was "most likely 24 hours old or less." . . .
. . . .

[Dr. Gilbert-Barness'] report had not been authenticated, is inadmissible hearsay and should not be considered[.] . . . DHS could have called Dr. Gilbert-Barness to testify at the [foster custody hearing], but elected not to for unknown reasons. . . .
Moreover, Dr. Gilbert-Barness' purported report is nothing more than an admission that she has flip flopped on her opinions regarding the timing of [Minor]'s injuries.
(Emphasis added.) Additionally, in attempting to call into question the timing of Minor's injuries, DHS disregarded the testimony given at the foster custody hearing by: (1) Dr. Tasaki, the MMMC surgeon who tended to Minor's injuries, that Minor's injuries occurred "less than 36 hours" before surgery; (2) Camilo Rosales, M.D., who assisted Dr. Tasaki in the surgery, that Minor's injuries "couldn't have occurred more than 12 to 24 hours" before the surgery; and (3) Anthony Manoukian, M.D., a forensic pathologist, that Minor's injuries "occurred within 48 hours" before the surgery. Consequently, DHS's contention is unavailing.
We, therefore, hold that the circuit court did not err in applying the doctrine of collateral estoppel in rendering partial summary judgment in favor of the Kaho`ohanohanos and that the trial court, in turn, correctly upheld that ruling in its first amended trial order.
b. proximate or legal cause
It is well-established in this jurisdiction that, in the context of negligence actions,
the best definition and the most workable test of proximate or legal cause so far suggested seems to be this: "The actor's negligent conduct is a legal cause of harm to another if (a) his or her conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted in the harm.

Mitchell v. Branch, 45 Haw. 128, 132, 363 P.2d 969, 973 (1961). Under the Mitchell test, a defendant's negligence need not have been the whole cause or the only factor in bringing about the harm. It was enough that his or her negligence was a substantial factor in causing plaintiff's injuries.

*582 . . . .
The Mitchell test represents a realistic approach to problems of causation, an area which has long been complicated by a failure to distinguish between questions of fact and policy concerns. The first arm of the test contemplates a factual determination that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of.
The second arm of the Mitchell test contemplates inquiry where there are policy concerns or rules of law that would prevent imposition of liability on the negligent party although his negligence was clearly a cause of the resultant injury.
Taylor-Rice v. State, 91 Hawai`i 60, 74-75, 979 P.2d 1086, 1100-01 (1999) (original brackets, ellipsis, and other citations omitted) (emphases in original) (some format altered) [hereinafter, Taylor-Rice I].
DHS argues that, because the trial court failed to make any factual finding on who caused Minor's April 16, 2001 injuries, the trial court could not properly find that DHS's actions were the legal or proximate cause of that injury. Specifically, DHS asserts that Minor
was in contact with numerous people besides Denise and Daryl from April 14-16. Any one of those individuals . . . could have inflicted the injury. Denise had no reason to suspect that any of those individuals would harm [Minor], and the possibility of [Minor's] unforeseen injury by one of these individuals would prevent DHS's approval of Denise's custody from being the proximate (as opposed to "but for") cause of [Minor]'s April injury. . . . In short, if [Minor]'s injuries were inflicted by unknown third parties, DHS's approval of Denise's custody is not the proximate cause of [Minor]'s injuries.
(Emphases in original.) We, however, cannot agree with DHS that, in order to find that DHS's actions were the legal cause of Minor's injuries, the trial court must identify the perpetrator. In essence, DHS is again attempting to bypass the family court's ruling that Minor was injured while in the care and custody of Denise.
Legal liability requires that the negligent party's conduct is a "substantial factor" in bringing about the harm. Taylor-Rice I, 91 Hawai`i at 74, 979 P.2d at 1100. Based upon the fact that "the perpetrator had not been determined [after the February 14, 2001 incident and] Ms. Brewerton's willingness and rush to entrust the care of [Minor] to Denise, complete disregard of the medical evidence, and lenient verbal service agreement," and that Minor suffered injuries while in Denise's care and custody, the trial court concluded that the Kaho`ohanohanos had proven "a reasonably close causal connection between DHS's actions and [Minor]'s resulting April 16, 2001 injuries." COL No. 45. See also Estate of Klink ex rel. Klink, 113 Hawai`i at 352, 152 P.3d at 524 ("the trial court, sitting as the trier of fact, is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence") (internal quotation marks and citation omitted). As the trial court stated, "[h]ad DHS taken custody away from Denise, required supervised visits, or had a more strict service agreement[,] it is highly likely [Minor] would not have been injured." COL No. 45. Accordingly, we believe that the trial court correctly concluded that DHS's conduct legally caused Minor to sustained the April 16, 2001 injuries.
C. Negligent Infliction of Emotional Distress (NIED)
This court has determined that
a plaintiff may recover for [NIED], absent any physical manifestation of his or her psychological injury or actual physical presence within a zone of danger, where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case. . . . Thus, an NIED claim is nothing more than a negligence claim in which the alleged actual injury is wholly psychic and is analyzed utilizing ordinary negligence principles.
Doe Parents No. 1, 100 Hawai`i at 69, 58 P.3d at 580 (internal quotation marks, citations, and original brackets omitted). Further, this court has consistently held, "as a general *583 matter, that the plaintiff must establish some predicate injury either to property or to another person in order himself or herself to recover for [NIED]." Id. (citations omitted).
The trial court, in its first amended trial order, concluded that DHS was liable for NIED upon the Kaho`ohanohanos. COL No. 56. In reaching its conclusion, the trial court explained that:
54. The facts and circumstances of this case clearly lead to the conclusion that a normally constituted reasonable person in [Minor] and/or Jarrett's position would suffer significant emotional distress.
55. [Minor] and Jarrett have both suffered emotional distress as a result of the events that took place between February 14, 2001 and April 16, 2001. To this day, [Minor] continues to have nightmares and be sensitive about the appearance of her abdominal scar and her left foot. She also gets teased at school. Jarrett's observation of the effects on the April 16 injuries upon [Minor] has caused him emotional distress as well. The psychological effects of the April 16 events on both [Minor] and Jarrett are significant.
COL Nos. 54-55.
DHS, however, challenges the trial court's conclusion and its award of damages for NIED to the Kaho`ohanohanos. DHS's argument in its entirety is that:
Because [Minor] is not entitled to recover for negligence (there being no duty), it follows that she and Jarrett are likewise not entitled to recover on their derivative [NIED] claim.
Moreover, the court erred by holding DHS liable for Jarrett's emotional distress. Hawai`i appellate courts exercise caution in upholding emotional distress claims:
[I]n general, courts are prompted to limit recovery for emotional distress because (1) it is temporary and often trivial, (2) it may be imagined and is easily feigned, and (3) it may seem unfair to hold defendants, whose actions were merely negligent, financially responsible for harm that appears remote from the actual conduct.

Doe [Parents No. 1], 100 Hawai`i [at] 69, 58 P.3d [at] 580 [(citations omitted)] (emphasis added). DHS had no common law or statutory duty to [Minor]. But even if DHS were liable for negligence in its investigation, public policy and Hawai`i case law do not support imposing liability on DHS for the remote unforeseeable emotional injury to an abused child's legal custodian.
Emotional distress is an unavoidable element of modern life. In Thing v. LaChusa, [48 Cal.3d 644, 257 Cal.Rptr. 865,] 771 P.2d 814 (Cal.1989),[[40]] the California Supreme Court recognized that:
Emotional distress is an intangible condition experience[d] by most persons, even absent negligence, at some time during their lives. Close relatives often suffer serious, even debilitating, emotional reactions to the injury, death, serious illness, and evident suffering of loved ones. These reactions occur regardless of the cause of the loved one's illness, injury, or death. That relatives will have severe emotional distress is an unavoidable aspect of the "human condition." The emotional distress for which monetary damages may be recovered, however, ought not to be that form of acute emotional distress or the transient emotional reaction to the occasional gruesome or horrible incident to which every person may potentially be exposed in an industrial and sometimes violent society.

Id. at 82[8-29] (emphases added). DHS is not the insurer of a non-custodial child's safety, and it follows that DHS is likewise *584 not the insurer of a legal custodian's emotional well-being.
(Emphases in original.)
Initially, we observe that, based upon the above conclusions that DHS had a duty to protect Minor, breached that duty, and that such breach was the proximate or legal cause of Minor's injuries, thereby entitling Minor to damages for DHS's negligence, DHS's arguments that it had no duty to Minor or that Minor was not entitled to recover for negligence are without merit. Second, although inartfully worded, DHS appears to argue, with respect to Jarrett's NIED claim, that, because Minor was not in Jarrett's physical custody at the time of her injuries, i.e., he was not a witness, Jarrett's psychological injuries were too remote from DHS's conduct to permit recovery for NIED. In support, DHS quotes a passage from Doe Parents No. 1, which does not lend support to its contention. The concerns expressed in Doe Parents No. 1 related to this court's recognition that
there is a need to strike a balance between avoiding the trivial or fraudulent claims that have been thought to be inevitable due to the subjective nature of such injury, on the one hand, and promoting the underlying purpose of negligence law, i.e., compensating persons who have sustained emotional injuries attributable to the wrongful conduct of others, on the other.
100 Hawai`i at 68, 58 P.3d at 579 (internal quotation marks, citations, and original brackets omitted). In resolving its concerns, this court concluded that recovery for NIED by one not physically injured is generally permitted only when there is "some predicate injury either to property or to another person" resulting from the defendant's conduct. Id. at 69, 58 P.3d at 580 (citation omitted). Thus, to recover for NIED, Jarrett was required to establish some predicate injury to property or to another person; his physical presence and witnessing of Minor's injury is not required.
Third, DHS contends that public policy and Hawai`i case law do not support imposing liability on DHS, stating only that "[e]motional distress is unavoidable element of modern life"[41] and providing no discernible argument in support of its public policy contention. Without more, DHS's argument in this regard also fails. See Wisconsin v. Pettit, 171 Wis.2d 627, 492 N.W.2d 633, 642 (Ct.App.1992) (declining to address portions of a brief "so lacking in organization and substance that for [the court] to decide [the] issues, [it] would first have to develop them[,] . . . [and] serve as both advocate and judge"); see also Citicorp Mortgage Inc. v. Bartolome, 94 Hawai`i 422, 433, 16 P.3d 827, 838 (2000) ("[a]n appellate court does not have to address matters for which the appellant has failed to present discernible argument").
Nonetheless, based upon the undisputed FOFs, the trial court correctly concluded that "Jarrett's observation of the effects of the April 16 injuries upon [Minor] has caused him emotional distress[.]" COL No. 55. Specifically, the FOFs established that: (1) when the April 16, 2001 injuries occurred, Jarrett went to the emergency room and was initially told that his daughter had several broken bones, bruising to her upper body, chest, and back, and that she was in serious condition, FOF No. 139; (2) Jarrett was later told at the MMMC that "there was a chance of [Minor] expiring," FOF No. 157; and (3) Jarrett immediate flew to O`ahu to be with Minor at the KMC where he was again informed that she may die. Id. Jarrett personally witnessed Minor's suffering, including the terrorizing nightmares she experienced. FOF Nos. 198, 221, 222. Accordingly, we hold that the trial court did not err in finding DHS liable to the Kaho`ohanohanos for NIED.[42]
*585 D. Joint and Several Liability
Lastly, relying on a recent amendment to Hawaii's joint tortfeasor law, specifically as it relates to government entities, DHS argues that the trial court erred in finding DHS jointly and severally liable. With regard to joint and several liability in actions involving injury or death, HRS  663-10.9 (Supp.2005) provides in relevant part:
Joint and several liability for joint tortfeasors . . . is abolished except in the following circumstances:
(1) For the recovery of economic damages against joint tortfeasors in actions involving injury or death to persons;
. . . .
(3) For the recovery of noneconomic damages in actions . . . involving injury or death to persons against those tortfeasors whose individual degree of negligence is found to be twenty-five per cent or more under section 663-31. . . .
(4) For recovery of noneconomic damages in motor vehicle accidents involving tort actions relating to the maintenance and design of highways including actions involving guardrails, utility poles, street and directional signs, and any other highway-related device upon a showing that the affected joint tortfeasor was given reasonable prior notice of a prior occurrence under similar circumstances to the occurrence upon which the tort claim is based. . . .
(Emphases added.) In cases involving a government entity, HRS  663-10.5 (Supp.2005) provided in relevant part that:

Notwithstanding sections 663-11 to 663-13 [(joint tortfeasors)], 663-16 [(indemnity)], 663-17 [(right to contribution by third party)], and 663-31 [(contributory and comparative negligence)], in any case where a government entity is determined to be a tortfeasor along with one or more other tortfeasors, the government entity shall be liable for no more than that percentage share of the damages attributable to the government entity.

(Emphases added.) Conspicuously absent from the list of statutes referenced in the above "notwithstanding" phrase is "HRS  663-10.9," which became the focus of a recent case decided by this court, to wit: Kienker v. Bauer, 110 Hawai`i 97, 129 P.3d 1125 (2006). The plaintiffs, in Kienker, were injured in a two-car accident and brought action against the driver of the other vehicle and the State, seeking economic and noneconomic damages. Id. at 100, 129 P.3d at 1128. With regard to the State, plaintiffs specifically claimed that the State negligently failed to install a left turn lane at the intersection of a highway where the accident occurred. Id. A jury-waived trial on the issue of liability resulted in favor of the plaintiffs. Id. The trial court ultimately ruled that the State was (1) twenty percent at fault and (2) jointly and severally liable for plaintiffs' noneconomic damages under HRS  663-10.9(4) (Supp. 2005). Id. at 100-02, 129 P.3d at 1128-30.
The State appealed, challenging the trial court's conclusion and arguing that HRS  663-10.5 abolished the State's joint and several liability. Id. at 104, 129 P.3d at 1132. On appeal, this court held that HRS  663-10.5 does not supersede or implicitly repeal HRS  663-10.9 ÔÇö specifically, subsection (4), which expressly allows for recovery of noneconomic damages in motor vehicle accidents involving maintenance and design of highways ÔÇö because the language of section 663-10.5 did not express any legislative intent to supersede section 663-10.9. Id. at 108-09, 129 *586 P.3d at 1136-37. This court explained that "[t]he express language of HRS  663-10.5 lacks any mention of Section 663-10.9. Although HRS  663-10.5 was enacted after HRS  663-10.9, HRS  663-10.5 does not state that it supercedes HRS  663-10.9(4). That such language is lacking is significant, and one must assume, intended." Id. at 108, 129 P.3d at 1136 (citation omitted). This court further observed that:
Had the legislature intended that HRS  663-10.5 should supercede HRS  663-10.9 or exempt the State from joint and several liability . . ., it could have easily and clearly said so by including Section 663-10.9(4) in the introductory "Notwithstanding" clause of Section 663-10.5. The legislature could also have employed broader exclusionary language in the introduction to HRS  663-10.5.
Words such as "notwithstanding any other law to the contrary," which would have the effect advocated by the State and that have been utilized in other statutes, were not adopted.
Id. at 109, 129 P.3d at 1137 (citation omitted).
Presumably to correct this deficiency, the legislature in 2006, amended HRS  663-10.5. See 2006 Haw. Sess. L. Act. 112,  1. In so doing, the legislature, among other things, revised the "notwithstanding" phrase to include reference to HRS  663-10.9. Thus, HRS  663-10.5 (Supp.2007) currently provides in relevant part:
Any other law to the contrary notwithstanding, including but not limited to section 663-10.9, 663-11 to 663-13, 663-16, 663-17, and 663-31, in any case where a government entity is determined to be a tortfeasor along with one or more other tortfeasors, the government entity shall be liable for no more than that percentage share of the damages attributable to the government entity[.[43]]
(Underscored emphasis indicates new statutory language.) (Bold emphasis added.); see also 2006 Haw. Sess. L. Act 112,  1 at 325. The amendment essentially clarifies the relationship between HRS  663-10.5 and 663-10.9, i.e., effectively declaring that section 663-10.9 does not apply to governmental entity tortfeasors.
Act 112 became effective "upon its approval," 2006 Haw. Sess. L. Act 112,  3 at 326, on May 16, 2006, during the pendency of the trial in the instant case and before the trial court entered its final judgment. More importantly, the legislature specifically provided that the amendment "shall apply retroactively to the extent permitted by law." Norton, 3 Haw. at 304 (emphasis added).
On appeal, DHS argues that Act 112 clearly expressed the legislature's intent to abolish joint and several liability with respect to governmental entities, thereby limiting the State's liability to no more than the proportionate share attributed to it by the trier of fact (i.e., in this case, 29%). Therefore, DHS submits that the trial court erred in failing to apply Act 112 retroactively.
This court has stated that:
Generally, the law disfavors the retroactive application of statutes and rules. The United States Supreme Court, in Bowen v. Georgetown University Hospital, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), stated the following:
Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.
Kramer v. Ellett, 108 Hawai`i 426, 432, 121 P.3d 406, 412 (2005) (citations and original ellipsis omitted). This court has also stated that "Hawai`i statutory and case law discourage retroactive application of laws and rules *587 in the absence of language showing that such operation was intended." Gap v. Puna Geothermal Venture, 106 Hawai`i 325, 333, 104 P.3d 912, 920 (2004); see also HRS  1-3 (1993) ("No law has any retrospective operation, unless otherwise expressed or obviously intended."); Norton v. Paahana, 3 Haw. 300, 303-04 (1871) ("The first rule which applies in the construction of statutes is[ ] that they are not to be construed so as to affect pending cases and cause hardship to innocent parties, unless their terms are so explicit that no other construction can fairly be made." (Emphasis added.)).
Although the legislature has unequivocally declared that Act 112 "shall apply retroactively," 2006 Haw. Sess. L. Act 112,  3 at 326, the phrase "to the extent permitted by law," id., is not "so explicit." Id. Examination of the legislative history, however, sheds light upon the legislature's intent. Conference Committee Report No. 86 states:
To avoid any confusion as to the application of section 663-10.5, HRS, following Kienker, this measure is given retroactive application to the extent permitted by law so as to implement its intent without violating accrued or substantive rights.
Conf. Comm. Rep. No. 86, in 2006 Senate Journal, at 942 (bold emphasis added); see also Conf. Comm. Rep. No. 86, in 2006 House Journal, at 1809.
In its first amended trial order, the trial court concluded that Act 112 did not apply retroactively to this case, reasoning that:
65. Act 112 went into effect on 5/19/06, which is after [the Kaho`ohanohanos'] first filed their complaint in this action. Act 112 eliminated joint and several liability for governmental entities based on HRS  663-10.9, and[,] if applied retroactively[,] would detrimentally impair and affect [the Kaho`ohanohanos'] measure of damages which is a substantive right. The express language of Act 112 states that it will apply retroactively "to the extent permitted by law." The legislature's Conference Committee report confirms the limits on the retroactive application of Act 112 to the extent it applies "without violating accrued or substantive rights."
66. The appropriate date for determining when [the Kaho`ohanohanos'] substantive right to joint and several liability vested was the date of the filing of the complaint, and retroactive divestiture would be manifestly unjust.

COL Nos. 65-66 (emphases added).
DHS, however, submits that application of Act 112 to this case would not "retroactively" divest the Kaho`ohanohanos of any "right" to recover jointly and severally from DHS because:
Act 112 merely clarified that [the Kaho'ohanohanos] never had this right. Act 112 does not itself abolish joint and several liability with respect to the State, but instead clarifies the intent of an existing statutory provision. Act 112 "correctly reflects the original intent of Act 213 [codified as HRS  663-10.5] prior to the Kienker decision" that [section] 663-10.9 does not apply with respect to governmental entities.
(Quoting Conf. Comm. Rep. 86, in 2006 Senate Journal, at 942.) (Emphases and some brackets in original.) According to DHS, retroactive application of Act 112 would not affect the Kaho`ohanohanos' substantive rights because they had no "right" to joint and several liability until judgment was entered in their favor. DHS explains that,
pursuant to the plain language of HRS  663-10.9(3), joint and several liability attaches only to joint tortfeasors who are "25 per cent or more" liable. It thus follows that [the Kaho`ohanohanos] had no right to recover jointly and severally from DHS until the [trial] court found DHS to be 25 percent or more liable. The court did not apportion liability until well after Act 112 had properly taken effect.
(Emphases in original.)
To the contrary, the Kaho`ohanohanos argue that "joint tortfeasor statutes create, define, and regulate rights, duties and obligations and are, therefore, substantive laws creating substantive rights." They contend that, were Act 112 to apply to this case, it *588 would violate their accrued and substantive right to jointly and severally collect the entire judgment from DHS. The Kaho`ohanohanos find support ÔÇö as does DHS ÔÇö for their respective positions in case law from other jurisdictions, discussed infra.
This court has defined substantive rights as
rights which take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability in respect to transactions or considerations already past, as distinguished from remedies or procedural laws which merely prescribe methods of enforcing or giving effect to existing rights.

Clark v. Cassidy, 64 Haw. 74, 77, 636 P.2d 1344, 1346-47 (1981) (emphases added) (internal quotation marks and footnotes omitted). This court, however, has not had the occasion to determine whether an amendment to the joint and several liability statute resulted in any substantive change to vested rights, thereby barring the retroactive application of such amendment. As pointed out by the Kaho`ohanohanos, courts from other jurisdictions that have examined this particular issue have concluded that a change in the right of recovery is deemed to have altered the parties' vested right and are substantive in nature.
In Basel v. McFarland & Sons, Inc., 815 So.2d 687 (Fla.Dist.Ct.App.2002), the applicable joint and several liability statute was amended to limit its application prior to the jury returning a verdict in plaintiff's favor. Id. at 690. The court summarized the pre-1999 statute and its subsequent amendment as follows:
The legislature enacted section 768.81(3), Florida Statutes, providing for liability to be determined on the basis of the percentage of fault of each tortfeasor. This 1986 enactment contained a provision applying the statute to causes of action arising after its effective date. Under this 1986 legislation, each party was liable for its own percentage of fault except that[,] if a defendant's percentage of fault equaled or exceeded that of the plaintiff, it was liable jointly and severally for the plaintiff's economic damages. The statute precluded joint and several liability for non-economic damages (i.e., pain and suffering), except where the amount of damages (economic and non-economic) was $25,000 or less.
The October 1, 1999 amendment to section 768.81 altered joint and several liability for economic damages based upon a sliding scale, depending upon whether the plaintiff was with or without fault and depending upon the percentage of fault of the defendant. The amendment made a defendant less than 10% at fault not subject to joint and several liability, regardless of whether the plaintiff had some fault or not. However, if the defendant was 10% to 25% at fault, his joint and several liability was capped at $200,000 if the plaintiff had some fault, and at $500,000 if the plaintiff was without fault.
Id. at 691 (citations and footnote omitted). At the outset, the Basel court observed that the 1999 amendment "significantly changed what [the plaintiff] could actually recover" from the defendant. Id. at 692. The court ultimately concluded that the 1999 amendment must be applied prospectively and was not applicable in this case because "the 1999 amendment constitute[d] a further alteration in a plaintiff's right to recover from a particular defendant for his injuries." Id. at 696. In so concluding, the court analogized and distinguished the facts of its case with cases involving a similar issue:
In [Florida Patient's Compensation Fund v. Von Stetina, 474 So.2d 783 (Fla.1985),] a statute provided that the [defendant] would pay any medical malpractice judgment over $100,000 at $100,000 a year. A subsequent amendment deleted the yearly cap. The supreme court held that the statutory amendment was remedial because:
The amendment does not alter the size of the judgment in favor of [the plaintiff]; rather it prescribes the method by which the judgment is to be paid. We find that the statute simply changes the form of its enforcement and does not substantially impair any existing rights.
474 So.2d at 788.

*589 Here, however, the 1999 amendment alters the size of [the plaintiff]'s enforceable judgment against certain of the defendants. Von Stetina is distinguishable.

Village of El Portal v. City of Miami Shores, 362 So.2d 275 (Fla.1978), holding that the Uniform Contribution Among Joint Tortfeasors Act could be applied retroactively as a remedial statute is likewise inapplicable. Before the Act, each defendant was liable for the full amount of the judgment. Under the Contribution Act[,] a defendant's liability was not increased, but the Act merely provided the method by which the liability of each of the tortfeasors could be limited to his pro rate share of the judgment. The court stated that the Contribution Act "does not increase the liability of any of the participants in the offense," and therefore it could be applied retroactively. In contrast, application of the 1999 amendment to section 768.81, Florida Statutes, to this case acts to decrease the preexisting legal liability of some of the defendants to the plaintiff.

Id. at 695 (some emphases in original and some added); see also Evangelatos v. Superior Court, 44 Cal.3d 1188, 246 Cal.Rptr. 629, 753 P.2d 585, 586-87 (1988) (holding that a measure, which modified the traditional, common law joint and several liability doctrine, did not apply to claims for relief that had accrued before the effective date of the new law); Nutt v. Champion Int'l Corp., 980 S.W.2d 365, 368 (Tenn.1998) ("Statutes that create a new right of recovery or change the amount of damages recoverable are . . . deemed to have altered the parties vested right and thus are not considered remedial." (Internal quotation marks and citation omitted.)).
Further, in Matthies v. Positive Safety Manufacturing Co., 244 Wis.2d 720, 628 N.W.2d 842 (2001), the Wisconsin Supreme Court reviewed whether a statute on contributory negligence that was amended after the plaintiff was injured, but before he filed his lawsuit, applied to limit the damages he could collect to an amount representative of each tortfeasor's causal negligence. Id. at 845-46. Specifically,
[a]t the time of the accident, joint and several liability was a common-law rule in Wisconsin which permitted a plaintiff to recover his or her damages from any one of two or more persons whose joint or concurring negligent acts caused the plaintiff's injury. After [the plaintiff's] accident, but before he filed this action, the legislature modified joint and several liability. The legislature modified the doctrine by amending the statute on contributory negligence . . . to limit joint and several liability to persons found 51% or more causally negligent.
Id. (citations and footnote omitted).
On appeal, the plaintiff contended that his claim accrued at the time of his injury, and the defendant-tortfeasor asserted that the plaintiff "ha[d] no vested or accrued right in a particular remedy" until a final judgment. Id. at 852. The court concluded that the plaintiff did "have a vested right to recover all of his damages that are adjudged due to him from any defendant that may be jointly and severally liable for his injuries." Id. The court explained that:
[The plaintiff] ha[d] a vested right in his claim for negligence. An existing right of action which has accrued under the rules of common law or in accordance with its principles is a vested property right. [The plaintiff's] negligence claim accrued on the date of his accident and injury. It is the fact and date of injury that sets in force and operation the factors that create and establish the basis for a claim of damages. Contrary to [the tortfeasor's] assertion, it is the date of injury which is the triggering event with respect to the application of [the amendment to the contributor negligence statute] ÔÇö the date that [the plaintiff's] claim accrued. Included in [his] negligence claim is the right to recover under an unmodified doctrine of joint and several liability since, at the time [his] claim accrued, common law imposed joint and several liability upon any jointly liable person.

Id. at 852-53 (emphases added) (internal quotation marks, citations, original brackets, and footnotes omitted). The court further reasoned that, because the plaintiff was entitled *590 to recover under the doctrine of joint and several liability when his claim accrued, the statutory change affected his vested rights. Id. at 853.
Conversely, DHS relies upon Phillips v. Curiale, 128 N.J. 608, 608 A.2d 895 (1992), for the proposition that the Kaho`ohanohanos had no right to joint and several liability until judgment was entered. In Phillips, the plaintiff, a member of the New Jersey National Guard, was injured while riding in an armored personnel carrier driven by the defendant, a fellow guard member. Id. at 897. At the time of his injury, the law of New Jersey permitted a guard member injured in the line of duty to sue fellow guard members for those injuries if they were attributable to the fellow guard member's negligence. Id. The plaintiff filed suit in 1980. Id. In 1987, during the pendency of his case, the New Jersey Legislature enacted a statute eliminating liability of guard members for negligence in the line of duty. Id. at 897. The legislature made the statute applicable to all actions or proceedings that "accrue, are pending or are filed after June 1, 1986," i.e., the first date of that year's summer training exercises. Id. at 898, 901 (internal quotation marks and citation omitted). As a result, the Law Division court granted summary judgment in favor of the defendant, and the Appellate Division affirmed. Id. at 898.
On appeal to the New Jersey Supreme Court, the plaintiff challenged the retroactive application of the statute. The court first determined that the statute did not retroactively apply to the plaintiff's claim because, inter alia, "the legislative history reveal[ed] an intent to apply the statute to all claims that accrued during the 1986 summer-training exercises[.]" Id. at 901. However, the court went on to consider whether the retroactive application of the statute would either unconstitutionally interfere with "vested rights" or be "manifestly unjust." Id. (internal quotation marks omitted). The court observed that:
Application of [an a]ct to tort claims which accrued before its effective date is not an unconstitutional abrogation of vested rights. An injured person's expectancy of tort recovery is an inchoate, unliquidated claim contingent on his or her ability to persuade a trier of fact of the merits of the claim. Such an expectancy falls short of being a vested right. A plaintiff has no vested property right in a particular measures of damages; the [l]egislature has broad authority to modify the scope and nature of such damages.
Id. at 903 (citation omitted). Consequently, the court concluded that "inchoate tort claims have not been regarded as vested rights of sufficient status to withstand, in all circumstances, a clear legislative intent to apply retroactively the amendments to plaintiff's cause of action." Id. at 904.
Phillips, however, is distinguishable. As the Kaho`ohanohanos point out and we agree, "the issue in Phillips related to restoring immunity among National Guardsmen to preclude them from suing each other, and did not involve joint and several liability."
Additionally, DHS ÔÇö in furtherance of its argument that retroactive application of Act 112 does not violate any of the Kaho`ohanohanos' accrued or substantive rightsÔÇö quotes (in its reply brief) the following statement from Tam v. Kaiser Permanente, 94 Hawai'i 487, 17 P.3d 219 (2001):
[A] statute providing remedies or procedures that do not affect existing rights, but merely alter the means of enforcing or giving effect to such rights, may apply to pending claims ÔÇö even those arising before the effective date of the statute.
Id. at 495, 17 P.3d at 227 (citations omitted). However, Tam does not assist DHS in strengthening its contention inasmuch as Tam simply provides the general rule of construction that a statute, in the absence of any indication as to retroactive application, would only be applied retroactively if such construction would result in a mere remedial or procedural change.[44]
*591 Lastly, DHS attempts to distinguish Matthies from the instant case, arguing that:
In Matthies, the Wisconsin [S]upreme [C]ourt held that a statutory bar could not be retroactively applied to preclude a common law Wisconsin rule permitting joint and several liability. Here, Act 112 was intended to clarify HRS  663-10.5, a provision on the books since 1994, which abolished joint and several liability with respect to a governmental tortfeasor. The legislative action here is not, as in Matthies, the application of a brand new bar to joint and several liability. The action here clarifies the parameters of joint and several liability for government entities as it existed even prior to [Minor]'s injuries.
(Emphasis in original.) DHS's argument that Act 112 is merely a clarification of "the original intent" is unpersuasive. At the time the Kaho`ohanohanos filed suit, they were entitled, pursuant to HRS  663-10.9, to recover economic damages against all joint tortfeasors and noneconomic damages against those tortfeasors whose pro rata share of negligence was found to be twenty-five per cent or more. By retroactively applying Act 112, their ability to recover damages from DHS would be greatly reduced as such recovery would be governed by HRS  663-10.5, limiting DHS's liability to "no more than that percentage share [(29%)] of the damages attributable to [it]." Clearly, the circumstances of this case are analogous to that in Matthies, and the rationale of the Wisconsin Supreme Court, discussed supra, is persuasive.
In a negligence action, the claim for relief does not accrue until plaintiff knew or should have known of defendant's negligence. See Yoshizaki v. Hilo Hosp., 50 Haw. 150, 154, 433 P.2d 220, 223 (1967) (holding that cause of action does not accrue until plaintiff knew or should have known of defendant's negligence; thus, medical malpractice action brought in 1963 based upon negligent diagnosis in 1959 not barred by statute of limitations where plaintiff learned of misdiagnosis in 1961); Yamaguchi v. The Queen's Med. Ctr., 65 Haw. 84, 90, 648 P.2d 689, 693-94 (1982) (holding that cause of action for medical malpractice accrues when "plaintiff discovers or should have discovered the negligent act, the damage, and the causal connection between the former and the latter"). In this case, Minor's claim for relief accrued when she was injured on April 16, 2001. See Graham Constr. Supply, Inc. v. Schrader Constr., Inc., 63 Haw. 540, 546, 632 P.2d 649, 653 (1981) (holding that a party's claim vested at the time the underlying transaction that gave rise to the claim occurred and, therefore, was unaffected by subsequent legislation that eliminated standing to bring the claim). In line with the reasoning of the Matthies court, the Kaho`ohanohanos' negligence claim includes the right to recover under an unmodified doctrine of joint and several liability inasmuch as, at the time their claim accrued, HRS  663-10.5 imposed joint and several liability for economic and noneconomic damages upon any jointly liable person. See Matthies, 628 N.W.2d at 852-53. Consequently, because the legislature did not intend for Act 112 to apply retroactively to divest the Kaho`ohanohanos' accrued or substantive rights, the trial court correctly concluded that Act 112 could not apply in this case.[45]

*592 IV. CONCLUSION

Based on the foregoing, we hold that: (1) the HRS  662-2 private analog exception is inapplicable to this case inasmuch as the Kaho`ohanohanos have met the threshold requirement of showing the existence of an analogous situation recognized in this jurisdiction to impose liability; (2) the plain language of HRS chapter 587, read in conjunction with its attendant regulatory mandates and policies, imposed upon DHS ÔÇö as the trial court so found ÔÇö a duty to protect Minor under the circumstances of this case from further abuse; (3) the trial court, although incorrectly announcing the application of the Youngberg professional judgment standard of care, properly applied the well-established reasonable person standard of care to this case to conclude that DHS breached its duty of care to Minor; (4) in so concluding, the trial court did not err in recognizing the collateral estoppel effect of the family court's oral ruling concerning Minor's custody at the time of her April 16, 2001 injuries; and (5) the trial court did not commit any error in finding that DHS's breach was causally connected to Minor's April 16, 2001 injuries. We further hold that the trial court properly found DHS (1) liable to the Kaho`ohanohanos for NIED and (2) jointly and severally liable for the entire damages award, less the amount Kaho`ohanohanos received from the settlement with the health care providers. Accordingly, we affirm the trial court's January 22, 2007 second amended judgment.
Concurring Opinion by LEVINSON, J.
I fully concur in the opinion of the court, including its citation of Lee v. Corregedore, 83 Hawai'i 154, 159, 925 P.2d 324, 329 (1996), for the proposition that "a `special relationship' between DHS and Minor is required to give rise to a duty on DHS's part to protect Minor from harm." Opinion of the court at ___, 178 P.3d at 563. I write additionally, however, solely to emphasize that I continue to adhere to my disagreement in Lee v. Corregedore, "for at least four reasons, with the calculus employed by the majority in [that] case in determining whether . . . a `special relationship'" existed between Corregedore, the Veterans Services Counselor employed by the State of Hawai'i Department of Defense, and Perreira, the deceased veterancounselee. See id. at 173-87, 925 P.2d at 343-57 (Levinson, J., dissenting, joined by Klein, J.). As such, I still believe that that appeal was wrongly decided.
Concurring Opinion by ACOBA, J.
I concur in the majority opinion[1] and with the majority's ultimate conclusion that the court did not err in finding Defendant/Third-Party Plaintiff/Third-Party Counterclaim-Defendant/Counterclaim Defendant/Cross-Claim Plaintiff-Appellant Department of Human Services (DHS) liable to Jarrett for Negligent Infliction of Emotional Distress (NIED).[2] Majority opinion at ___, 178 P.3d *593 at 592. However, I write separately to reiterate what I believe to be the applicable standard in NIED cases where the plaintiff has not suffered physical injury.

I.
In Rodrigues v. State, 52 Haw. 156, 472 P.2d 509 (1970), this court abandoned the physical injury rule, concluding that rather than requiring physical injury to the plaintiff as a guarantee of trustworthiness in NIED claims, "the preferable approach is to adopt general standards to test the genuineness and seriousness of mental distress in any particular case." Id. at 171, 472 P.2d at 519. Rodrigues developed the following standard: "[S]erious mental distress may be found where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." Id. at 173, 472 P.2d at 520. This court also opined that "psychic tort law in this jurisdiction [has] progressed beyond the categorical approach in deciding the viability of a mental distress claim." Guth v. Freeland, 96 Hawai'i 147, 159, 28 P.3d 982, 994 (Acoba, J., concurring and dissenting).
Despite the Rodrigues court's rejection of "the categorical approach," the recent evolution of our NIED jurisprudence has been characterized by the case-by-case creation of categorical exceptions to the physical injury rule. This court created such an exception for plaintiffs who were exposed to blood infected with HIV. John & Jane Roes v. FHP, Inc., 91 Hawai'i 470, 472, 985 P.2d 661, 663 (1999) (holding that "(1) Hawai'i law recognizes a cause of action for NIED arising out of a fear of developing AIDS following exposure to HIV-positive blood resulting in actual physical peril to the claimant; and (2) damages may be based solely upon serious emotional distress, even absent proof of a predicate physical injury" (emphasis added)). In Guth, this court adopted the already widely recognized exception to the general rule that allows plaintiffs whose decedent's corpse had been mishandled to bring a claim for NIED. 96 Hawai'i at 154, 28 P.3d at 989 (adopting a rule "that does not require the plaintiff's emotional distress to manifest itself in a physical injury" in cases involving the mishandling of a corpse). Doe Parents No. 1 v. State, 100 Hawai'i 34, 58 P.3d 545 (2002), saw the creation of yet another exceptionÔÇöfor parents' claims of emotional distress for minor victims of non-violent sexual assault. Id. at 70, 58 P.3d at 581 (concluding that when a child is molested, "the child's resulting psychological trauma, as well as that of the child's parents, involves circumstances that guarantee its genuineness and seriousness" such that the child and his or her parents may bring a claim for NIED without alleging any predicate physical injury (brackets, internal quotation marks, and citation omitted)). In this case, in sustaining Jarrett's NIEp claim, the majority declares, apparently as a predicate to recovery for NIED, that there must be "some physical injury to property or another person resulting from the defendant's conduct." Majority opinion at ___, 178 P.3d at 582-83 (quoting Doe Parents No. 1, 100 Hawai'i at 69, 58 P.3d at 580 (citation omitted)) (internal quotation marks omitted). But, this is merely the description of the result reached by the categorical rule approach applied in Doe Parents No. 1 and in this case, and is not the product of a generally applicable rule allowing recovery for NIED.

II.

A.
The better approach is to create a standard of general applicability rather than to continue creating exceptions to the physical injury rule. "Recognition of negligently inflicted psychic injury as an independent tort, like the life experiences that compel it, cannot be confined in a doctrinal straitjacket." Guth, 96 Hawai'i at 159, 28 P.3d at 994 (Acoba, J., concurring and dissenting) (internal citations omitted). Therefore, it must be reiterated that "the advantages gained by *594 the courts in administering claims of mental distress by reference to narrow categories [are] outweighed by the burden thereby imposed on the plaintiff and that the interest in freedom from negligent infliction of serious mental distress is entitled to independent legal protection." Doe Parents No. 1, 100 Hawai`i at 91, 58 P.3d at 602 (Acoba, J., concurring) (quoting Guth, 96 Hawai`i at 159, 28 P.3d at 994 (Acoba, J., concurring and dissenting) (quoting Rodrigues, 52 Haw. at 173-74, 472 P.2d at 520)) (alteration and internal quotation marks omitted). Thus, I would apply the general rule articulated in Rodrigues to all NIED claims and abandon the piecemeal abrogation of the physical injury rule exemplified by the current state of our precedent. See id. ("Applying the Rodrigues standard returns reason and symmetry to the law. . . ." (Quoting Guth, 96 Hawai'i at 159, 28 P.3d at 994. (Acoba, J., concurring and dissenting))) (brackets omitted). As previously stated, Rodrigues rejected "the physical injury requirement and the categorical approach to claims of psychic tort sounding in negligence. . . ." Guth, 96 Hawai'i at 159, 28 P.3d at 994 (Acoba, J., concurring and dissenting).

B.
Jarrett's psychological injuries arose after Minor was taken from her pediatrician's office to Maui Memorial Medical Center (MMMC) and later, Kapiolani Medical Center (KMC) on O'ahu. See Finding of Fact (FOF) no. 139 (Jarrett was told that Minor was "in bad condition" at MMMC); FOF no. 157 (Jarrett was told that Minor might die at MMMC and again at KMC); FOF no. 221 (Minor is "often terrorized by nightmares" which require Jarrett "to comfort her back to sleep"); see also COL no. 55 (Jarrett's observation of Minor's injuries and their aftermath caused him emotional distress).
Applying the Rodrigues standard to the case at bar, I conclude that "a reasonable [person], normally constituted, would be unable to adequately cope[,]" Rodrigues, 52 Haw. at 173, 472 P.2d at 520, with the severe mental distress engendered upon learning that one's child has suffered potentially fatal injuries, and the court was therefore correct in finding liability for this claim. This court has acknowledged in several situations that family members are naturally susceptible to "severe mental distress" as a result of mistreatment of their loved ones. See Doe Parents No. 1, 100 Hawai`i at 70, 58 P.3d at 581 (allowing the parents of a child who had been molested to recover damages for their resulting psychological trauma); id. at 91, 58 P.3d at 602 (Acoba, J., concurring) (recognizing that a child's parents are among those most likely to suffer severe mental distress as a result of child being sexually molested); Guth, 96 Hawai`i at 152, 28' P.3d at 987 (noting that in special cases, such as where a corpse is mishandled, there "is an especial likelihood of genuine and serious mental distress . . . which serves as a guarantee that the [NIED] claim is not spurious" (emphasis omitted)); id. at 159, 28 P.3d at 994 (Acoba, J., concurring and dissenting) (noting that "there is near universal agreement that a reasonable person, normally constituted, may be unable to cope with the mental stress" caused by a family member's corpse being mishandled).
Here, Jarrett was confronted with grievous mistreatment of his young daughter that resulted in grave danger to her. I would conclude that a reasonable jury could find that "a reasonable [person], normally constituted, would be unable to adequately cope" with the emotional distress generated by witnessing the effects of child abuse perpetrated on one's child. See Rodrigues, 52 Haw. at 173, 472 P.2d at 520 (concluding that "[c]ourts and juries which have applied the standard of conduct of the reasonable [person] of ordinary prudence are competent to apply a standard of serious mental distress based upon the reaction of the reasonable [person]" (citation and internal quotation marks omitted)). Thus, I concur that the court did not err in finding DHS liable to Jarrett for NIED.

III.
Finally, I note that the disposition of this case by the majority is not consistent with that of Liberty Mutual, in which a majority of this court held that a father who saw his injured son immediately after a serious automobile accident was not entitled to damages *595 for his emotional distress under his automobile insurance policy.[3] 108 Hawai`i at 388, 120 P.3d at 1123. The majority reasoned that the father did not have an independent tort claim because he was not involved in the accident. Id at 386,120 P.3d at 1121.
In Liberty Mutual, the majority acknowledged that "[Hawai`i Revised Statutes (HRS) ]  431:10C-306(b) and this court's decision in [First Insurance Co. of Hawai`i, Ltd v.] Lawrence, [77 Hawai'i 2, 881 P.2d 489 (1994),] are dispositive of the-issue before this court." 108 Hawai`i at 385, 120 P.3d at 1120. The majority continued, opining that "pursuant to the plain and unambiguous language of HRS  431:10C-306(b), persons . . . may assert a claim for accidental harm as long as the threshold requirements are metÔÇöthe first being that death or injury occurs `to such person in' a motor vehicle accident." Id (quoting Lawrence, 77 Hawai`i at 8, 881 P.2d at 495 (emphasis in original)) (ellipsis in original) (brackets, footnote and internal quotation marks omitted). The majority then interpreted Lawrence as ruling "that NIED claims are derivative under Hawaii`s no-fault law unless the claimant witnessed the event causing injury or death to the host plaintiff."[4]Id. at 387, 120 P.3d at 1122. Respectfully, that statement of the exception articulated in Lawrence was incomplete.
In Lawrence, this court seemingly recognized an exception to the rule that a plaintiff claiming NIED be involved in the predicate incident. See Liberty Mutual, 108 Hawai`i at 389, 120 P.3d at 1124 (Acoba, J., dissenting); see also Lawrence, 77 Hawai`i at 13, 13 n. 15, 881 P.2d at 500, 500 n. 15 (because it was undisputed that the plaintiffs "did not witness the accident nor were they timely present at the immediate scene of the accidentU" the court did not apply the rale from "Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990)[,] wherein [that] court recognized a cause of action for witnessing serious injury to a close relation in either viewing the event causing the injury or coming onto the scene of the event soon thereafter" (internal citations and footnote omitted)). The exception allowed witnesses to the accident, and by corollary, those who were "timely present at the immediate scene of the accident[,]" to bring independent NIED claims. Liberty Mutual, 108 Hawai`i at 389, 120 P.3d at 1124 (Acoba, J., dissenting) (quoting Lawrence, 77 Hawai`i at 13, 881 P.2d at 500 (internal quotation marks and citation omitted)).
Although Lawrence considered NIED cases in the context of statutory no-fault insurance claims, the above noted exception was derived from Lejeune, which considered NIED in the "pure tort" context. The focus on the "plain and unambiguous" meaning of "in" as it relates to HRS  431:10C-306(b) in Liberty Mutual, id. at 385, 120 P.3d at 1120, was inconsistent with this court's prior recognition of the above-noted exception for persons "timely present" at the scene of the accident, indicating that the term "in" was not in fact conclusively unambiguous. Inasmuch as Lawrence controlled the decision in Liberty Mutual as much as the language of the no-fault automobile insurance statute, the question of whether the father in Liberty Mutual was "timely present at the immediate scene" was a question that should have been submitted to the trier of fact because "reasonable people could differ" on the issue. *596 Id. at 390-91, 120 P.3d at 1125-26 (Acoba, J., dissenting).
As a result, because the majority failed to apply the "timely on the scene" exception to the plaintiff in Liberty Mutual, the decision in that case was inconsistent with Lawrence. The result is vastly disparate treatment of similarly situated parties, as illustrated by a comparison of the facts in Liberty Mutual and this case. In Liberty Mutual, (1) a police officer informed the plaintiff-father that his minor son had been involved in an automobile accident and that the police were calling a medevac helicopter; (2) the father ran approximately 100 yards to the scene of the accident and began searching for his son; (3) the father observed two other victims, neither of whom seemed seriously injured, leading the father to deduce that the medevac helicopter was coming for his son; (4) the father eventually located his son,' who was being treated in an ambulance; (5) the father (a) observed that his son was being intubated, indicating that he was not breathing on his own, (b) his son had blood on his face, (c) his son was unconscious and unresponsive, (d) no one would tell the father if his son would survive, (e) upon arrival at the hospital, the father was informed that his son was in critical condition, and (f) the son was in a coma, which persisted approximately two months. Id. at 382-83, 120 P.3d at 1117-18.
In the instant ease, (1) on April 14, 2001, Jarrett dropped off Minor, who was in general good health, to her mother; (2) on April 16, 2001, after Minor vomited several times, her mother took her to see the pediatrician, who observed that Minor appeared to be in shock; (3) because of the severity of Minor's symptoms, the pediatrician had her taken to MMMC by ambulance; (4) Jarrett arrived at MMMC after Minor and was informed by hospital personnel that Minor "was in bad condition[,]" causing him to fear for her; (5) once Minor was stabilized, she was transported by helicopter to KMC and Jarrett joined her there; (6) Minor was comatose and unresponsive when she was admitted to KMC; (7) Jarrett was informed of the possibility that Minor could die at MMMC and again at KMC as a result of her injuries; (8) Minor remained at KMC for over two months, including a two-week stay in the Intensive Care Unit; and (9) medical experts opined that Minor would suffer ongoing psychological effects as a result of her injuries.
Thus, in both cases, the parent seeking recovery for NIED did not witness the incident in which the child sustained injuries, but did observe the child in a life-threatening medical emergency shortly thereafter, and also observed the long-term results of those injuries. The majority of this court denied the father recovery in Liberty Mutual on the ground that his emotional injury was too remote from the automobile accident, but does grant recovery to Jarrett despite the fact that his psychological injuries are just as remote from the incident that actually caused Minor's injuries.

IV.
For the reasons stated above, I agree with the result on this NIED issue to the extent it is consistent with the Rodrigues rule rather than the categorical physical injury rule.
NOTES
[1] Unless otherwise indicated, the Honorable Joel E. August presided over the underlying proceedings. For purposes of clarity and ease of discussion, any rulings made by Judge August are referred to as made by "the trial court."
[2] Denise and Daryl are not parties to the instant appeal.
[3] As discussed more fully infra, the United States Supreme Court in Youngberg held that "the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. 2452 (footnotes omitted).
[4] The remaining liability of thirty-one percent was attributed to the health care providers involved in the treatment of Minor's injuries. As explained infra, the actions of certain health care providers led to a companion medical malpractice action, which was eventually consolidated with the instant action and ultimately dismissed pursuant to a settlement.
[5] The Honorable Shackley F. Raffetto presided over the motion for partial summary judgment; any rulings made by Judge Raffetto are referred to as made by "the circuit court."
[6] The Honorable Geronimo Valdriz presided over Minor's foster custody proceedings; any rulings made by Judge Valdriz are referred to as made by "the family court."
[7] HRS  662-2 provides that "[t]he State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." (Emphases added.)
[8] HRS  587-26 (2006) provides that a service plan is a "specific written plan" that sets forth, inter alia, the "steps that will be necessary for the child to remain in a safe family home[.]"
[9] HRS  346-14(1) and -14(10) (1993) provide that DHS shall "adopt rules as deemed necessary for all public assistance programs" and "[a]dopt rules governing the procedure in hearings, investigations, recording, . . . and conduct other activities as may be necessary or proper to carry out this chapter[.]"
[10] Dr. Dixon placed Minor in split Russell traction to stabilize the femur, then placed her in a double Spica cast from her nipple line down to both feet, with both legs enclosed and a bar between the legs for support. The cast contained an opening for diapers. Minor was discharged from the hospital on February 22, 2001 and remained in the cast for eight weeks. FOF No. 36.
[11] Pursuant to DHS's "Child Welfare Services Branch Procedural Manual" [hereinafter, the Green Book], the intake case worker is required to make an initial risk assessment. An intake case worker's assessment includes "find[ing] out any past [CPS] history for any of the parties mentioned in the case[, e.g., whether family members have any previous CPS history of similar allegations, whether the parties involved had been, as children, the subject of a CPS case, etc.]." Once the intake case worker's initial report is completed, the report is passed on to a supervisor, who reviews the information and decides whether or not to assign the case to a social worker for further investigation.
[12] According to Ms. Gnehm-Wright, a level four social worker "is just one step below a supervisor and they can work independently, make most independent decisions, and you know just keep the supervisor informed of what's going on in the cases they are assigned."
[13] Ms. Brewerton, however, did not interview Dr. Fox, who was also Minor's treating physician at the MMMC. FOF No. 57. Dr. Fox "prepared a report that concluded that [Minor]'s [February 14, 2001] injury was caused by `non-accidental trauma.'" Id. Ms. Brewerton did not obtain a copy of the report. Id.
[14] Each DHS social worker is required to maintain a log of contacts that memorializes "clear and specific material pertinent to the client's situation and the service delivery and to support the case plan." FOF No. 51 (citations to trial exhibits omitted).
[15] The MDT "is made up of various professionals of various disciplines that join to make comments and recommendations on CPS cases," FOF No. 89, and its role is "consultative" only. According to DHS's policy, "an MDT meeting `MUST' be held during the assessment phase for `serious harm' cases, such as cases involving a fracture or hospitalization. The policy also states that the MDT should be held within ten days of the intake." FOF No. 90. The Green Book also provides that "an MDT meeting is required when a child suffers an injury that involves a fracture or who was hospitalized and is ready to be returned home." FOF No. 91; see also FOF No. 92.
[16] In his report, Dr. Briley also recommended that DHS (1) "careful[ly] question[]" Denise and Daryl's drug use and (2) conduct psychological evaluations of Denise and Daryl because "they might show hitherto hidden problems consistent with the development of abuse tendencies[.]" The record does not reveal any psychological examination of Denise or Daryl prior to the April 16, 2001 injuries.
[17] Jarrett also testified that he observed "perfect circles that resembled like a burn of some kind" prior to Minor's February 14, 2001 injury; however, Denise explained to him that it was probably a rash. He stated that Ms. Brewerton did not inquire of him about the markings.
[18] Minor's injuries included, inter alia, trauma with a jejunal (small intestines) laceration/duodenal hematoma (internal bleeding of the duodenal-a hollow jointed tube connecting the stomach to the jejunum); pancreatic edema/pancreatis; a closed head injury with internal bleeding; shock with hypotension; metabolic acidosis (low blood pH); capillary leak; coagulopathy (defect in the body's mechanism for blood clotting) secondary to shock with multiple organ dysfunction; peritonitis (inflammation of the serous membrane which lines part of the abdominal cavity); sepsis (whole-body inflammation); hypertension (high blood pressure); hematemesis (vomiting of blood); contusions to the liver and spleen; "significant myocardial depression"; and a left rib and clavicle fracture. FOF Nos. 138, 146.
[19] At some point during surgery, the "anesthesiologist inadvertently struck [Minor]'s lung" in an attempt to place a central line; as such, Minor suffered "a left sided pneumothorax that resulted in the `complete collapse' of her left lung. Dr. Tasaki testified that the pneumothorax was unavoidable under the circumstances." FOF No. 151 (citation to the transcript and trial exhibit omitted). Moreover, a tourniquet had to be placed on Minor's left leg in an attempt to regain the IV access that was lost in the midst of the surgery. As Dr. Tasaki explained, the purpose for using the tourniquet was to "dispend the veins distal to the tourniquet to allow [his medical staff] to get the IV in [Minor]'s vein." However, medical personnel neglected to remove the tourniquet once IV access was regained, which resulted in additional injury to Minor's left leg. FOF Nos. 151-52. The tourniquet incident, along with other events related to Minor's treatment at the KMC served as the basis for the Kaho`ohanohanos' companion medical malpractice suit.
[20] Moreover, as a result of the tourniquet-related injury, Minor underwent numerous surgeries; however, Minor's foot remained abnormal in appearance and restricted in the range of motion. FOF No. 202.
[21] The MDT also stated in its report that:

There was insufficient information to assess the caretaker's parenting capabilities as well as other family members that had access to [Minor]. Based on the available information, the parents and mother's boyfriend cannot be ruled out as possible perpetrators. There was insufficient information on the caretaker's social systems. Biological father identified his parents and sister as an informal support; however, their ability to be protective is unknown. Further assessment will need to be conducted. As such, the home is assessed to be unsafe for [Minor].
[22] The Safe Family Home Reports are narrative reports, focusing "on the protection of the child and what intervention is needed to provide the child with a safe permanent home."
[23] A psychological examination of Daryl was conducted on March 6, 2002. The report revealed, inter alia, that Daryl

was using methamphetamine and marijuana on a daily basis. Mood has been occasionally anxious and irritable. Has been quite angry at multiple people[.]
[Daryl] went on to say that he used to use [m]ethamphetamine because he was on a "mission from God." Says people used to call him "Daryl[,] the demon hunter." Describes hearing footsteps outside his property and finding men dressed in military clothing and night vision goggles. . . . Also talked about spiritual experiences involving demons which he has on tape. Also talked about how women who used to practice black magic used to be attracted to him.
A psychological examination of Denise was also conducted sometime after the April 16, 2001 injuries. The examination revealed that Denise had an anger issue and a difficult time ending relationships with boyfriends.
[24] The Kaho'ohanohanos filed a separate medical malpractice claim against various MMMC health care providers, alleging that they negligently left the tourniquet on Minor's lower left leg that resulted in permanent damage to her foot. On January 5, 2005, the trial court consolidated the negligence and medical malpractice actions for trial. However, the medical malpractice case was ultimately dismissed inasmuch as the health care providers settled their claims with the Kaho'ohanohanos. Accordingly, unless otherwise indicated, any proceedings relating to the medical malpractice aspect have been omitted.
[25] Section 314A, entitled "Special Relations Giving Rise to Duty to Aid or Protect," provides in pertinent part that "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." Restatement (Second) of Torts  314A(4).
[26] The trial court observed that default judgments were entered against Daryl and Denise for failure to file responsive pleadings early in the litigation. COL Nos. 6, 8. Denise eventually filed her answer to the complaint and participated in the trial pro se, and, thus, the trial court considered Denise not to be in default. COL Nos. 6, 7.
[27] The trial court additionally observed that DHS's affirmative defense that the State is exempted from liability based upon the "discretionary function" exception (HRS  662-15(1) (1993)) to the State Tort Liability Act (STLA) (governing the State's limited waiver of sovereign immunity) did not apply to this case. DHS does not challenge the trial court's ruling on appeal.
[28] On January 17, 2007, the ICA dismissed DHS's appeal for lack of jurisdiction because neither the September 21, 2006 judgment nor the December 4, 2006 first amended judgment satisfied the requirements for an appealable final judgment under Hawai`i Rules of Civil Procedures (HRCP) Rule 58 (2007) and the holding in Jenkins v. Cades Schutte Fleming & Wright, 76 Hawai`i 115, 869 P.2d 1334 (1994).
[29] The court determined that the Sabia case could be analogized to circumstances that would create liability under Restatement (Second) of Torts  323 (1965), entitled "Negligent Performance of Undertaking to Render Services," and 324 (1965), entitled "Duty to One Who Takes Charge of Another Who is Helpless." See id. at 1194-95. The court also observed that a private analog can also be found in the state's emergency medical care (duty to assist) statute, 12 V.S.A.  519. Id. at 1194. Section 519 provides in relevant part that:

(a) A person who knows that another person is exposed to grave physical harm shall, to the extent that the same can be rendered without danger or peril to himself or without interference with important duties owed to others, give reasonable assistance to the exposed person unless that assistance or care is being provided by others.
(b) A person who provides reasonable assistance in compliance with subsection (a) of this section shall not be liable in civil damages unless his acts constitute gross negligence or unless he will receive or expects to receive remuneration.
The court explained that, in Sabia, "SRS workers had a statutory duty within the scope of their employment to provide assistance in response to the plaintiffs' credible reports of abuse; therefore, a cause of action based on their inaction is analogous to liability for civil damages under  519." Id. at 1194-95 (footnote omitted).
[30] The Kaho`ohanohanos also argue ÔÇö and DHS disputes-that, similar to Sabia, an analogous situation can be found in the Hawaii's "Duty to assist" statute (HRS  663-1.6 (1993)) and section 323 of the Restatement (Second) of Torts. We need not, however, in light of the above discussion, address the parties' contentions whether the instant case can be analogized on other grounds.
[31] It is well-established that, in order for a plaintiff to prevail on a negligence claim, the plaintiff is required to prove all four of the necessary elements of negligence: (1) duty; (2) breach of duty; (3) causation; and (4) damages. Takayama v. Kaiser Found. Hosp., 82 Hawai`i 486, 498-99, 923 P.2d 903, 915-16 (1996).
[32] HRS  350-2 (1993) requires DHS to "proceed pursuant to chapter 587 and [DHS's] rules" upon receiving a report concerning child abuse or neglect.
[33] Section 1.3.1 of the Green Book provides that "[a]ssessment of risk begins at the point a report of abuse or neglect is made and continues throughout [the course of the investigation]." Green Book at  1.3.1.
[34] Risk levels are considered to be "severe" when there is an alleged perpetrator in the home, the perpetrator is unknown, the alleged perpetrator denies harming the child, the perpetrator is the child's caregiver with unlimited access to the child, caregivers use methamphetamine, and the extended family has a history of confirmed reports of abuse that resulted in an out of home placement.
[35] Although the aforementioned cases were also relied upon by the Kaho`ohanohanos in further support of their contention that DHS had a duty to Minor, we observe that DHS posits that "those non-binding cases were wrongly decided," and would open "the door to a multitude of lawsuits,". DHS contends that:

liability is not the only mechanism for enforcing such a policy choice. There are many other existing mechanisms, short of lawsuits, that would strongly encourage behavior supportive of the policy choice reflected in the statutes, including an employee's moral sense of wanting to do the right thing, her desire to perform her job competently, her fear of being fired if she does not do her job well, and the accountability pressure on elected government officials (who appoint or otherwise control the DHS director) to insist upon competent performance by the director and his or her employees.
(Emphasis in original.) DHS nonetheless relied upon DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), for the proposition that a state child protective agency has no duty to protect a child outside its custody, quoting the United States Supreme Court's following language:
Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [the child] and his mother to receive adequate compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by [the child's] father. The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.
Id. at 202-03, 109 S.Ct. 998. However, as pointed out by the Kaho`ohanohanos, DeShaney is inapplicable because that case dealt with constitutional violations. The Court ruled that a state's failure to protect a child from an abusive parent, even if the state had received reports of and had investigated the possibility of abuse, did not constitute a violation of Due Process Clause of the Fourteenth Amendment to the United States Constitution, i.e., the state had no constitutional duty. Id. at 196-97, 109 S.Ct. 998. As the Court stated:
It may well be that, by voluntarily undertaking to protect [the child] against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger. But the claim here is based on the . . . Fourteenth Amendment, which, as we have said many times, does not transform every tort committed by a state actor into a constitutional violation. A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not all common-law duties owed by government actors were constitutionalized by the Fourteenth Amendment.
Id. at 201-02, 109 S.Ct. 998 (emphasis added) (internal quotation marks, citations, and original ellipsis omitted).
Moreover, DHS cites two additional state cases ÔÇö Beebe v. Fraktman, 22 Kan.App.2d 493, 921 P.2d 216 (1996), and Roe v. Department of Social & Rehabilitation Services, 278 Kan. 584, 102 P.3d 396 (2004) ÔÇö for the proposition that social services agencies have no duty to an allegedly abused child. However, both cases are distinguishable in that the courts in Beebe and Roe analyzed liability of Kansas' equivalent of Hawaii's DHS under the Restatement (Second) of Torts  324A, as opposed to a statutory-based analysis.
[36] In light of the above holding, DHS's argument that the trial court erred in its legal interpretation of the Youngberg professional judgment standard is moot.
[37] As previously stated, DHS expressly indicated, at the outset, that it "does not directly appeal the [trial] court's two hundred plus [FOFs]." Rather, DHS focused on the trial court's alleged "erroneous legal conclusions." (Emphasis in original.). However, in an attempt to cover its bases, DHS simply noted in its argument section relating to the standard of care issue that, "to the extent that the [trial] court's application of the facts to the law raises mixed questions of fact and law, the court's findings are clearly erroneous." (Original emphasis omitted.). In so noting, DHS apparently shifts the burden upon this court to comb through the 249 FOFs and determine which of the FOFs are erroneous. This court will "disregard [a] particular contention" if the appellant "makes no discernible argument in support of that position[.]" Norton v. Admin. Dir. of the Court, 80 Hawai`i 197, 200, 908 P.2d 545, 548 (1995) (citation omitted); see also Hawai`i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) (2007) ("Points not argued may be deemed waived"). Accordingly, without more, DHS's argument regarding any dispute it may have with any of the trial court's findings is deemed waived.
[38] DHS believes that the timing of Minor's injuries was critical:

Proof that [Minor]'s injuries were inflicted on or prior to April 13-three days before her hospitalization-would mean that [Minor] was injured while still in her father's care. This would necessarily relieve DHS from any liability because its decision to approve mother's assumption of the custody arrangement would obviously not be the proximate cause of injuries inflicted while [Minor] was in her father's care.
(Emphases omitted.).
[39] Karen Thompson, M.D. (Dr. Thompson), a board certified pediatric pathologist who initially opined that Minor's injuries occurred three or four days before the surgery, changed her view as a result of obtaining a second opinion from Dr. Gilbert-Barness.
[40] In Thing, plaintiff (the mother of an accident victim) brought an action against defendant-driver for the emotional distress she suffered when she arrived at the accident scene. 771 P.2d at 815. Mother did not witness the accident in which defendant-driver's automobile struck and injured her child. Id. The California Supreme Court held that mother who did not witness the accident could not recover damages from defendant-driver for emotional distress. 771 P.2d at 830.
[41] DHS's seemingly cavalier statement is rather ironic insofar as the emotional distress of Minor and Jarrett was avoidable but for DHS's negligence.
[42] We observe that the concurrence criticizes this court's above analysis and conclusion, stating that

the disposition of this case by the majority is not consistent with that of [Liberty Mutual Insurance Co. v. Dennison, 108 Hawai`i 380, 120 P.3d 1115 (2005)], in which a majority of this court held that a father who saw his injured son immediately after a serious automobile accident was not entitled to damages for his emotional distress under his automobile insurance policy. [Id.] at 388, 120 P.3d at 1123.
Concurring Opinion by Acoba, J. at ___, 178 P.3d at 594 (footnote omitted). However, Dennison does not apply to the facts of the instant case inasmuch as that case did not involve the common-law NIED claim, but instead an NIED claim brought pursuant to HRS  431:10C-306(b) (1993). Id. at 380, 384-84, 120 P.3d at 1115, 1119-20. The Dennison court observed that, "pursuant to the plain and unambiguous language of HRS  431:10C-306(b), persons may assert a claim for accidental harm [(which included emotional distress)] as long as the threshold requirements are met ÔÇö the first being that death or injury occurs `to such person in' a motor vehicle accident." Id. at 385 & n. 5, 120 P.3d at 1120 & n. 5 (internal brackets, ellipsis, footnote, and citation omitted) (emphasis in original).
[43] Act 112 also added an exception to highway maintenance and design, specifically providing that "joint and several liability shall be retained for tort claims relating to the maintenance and design of highways pursuant to section 663-10.9." 2006 Haw. Sess. L. Act 112,  1 at 325. In other words, the legislature expressed its intent to retain governmental joint and several liability for highway maintenance and design.
[44] Tam (a workers' compensation case) involved the retroactive application of the amendment to HRS  386-79 (1993 & Supp.1999), which limited the discretion of the director of Labor and Industrial Relations "in ordering medical examinations requested by employers by providing that, subsequent to the initial examination, further examinations may be ordered only when `good and valid reasons exist with regard to the medical progress of the employee's treatment.'" 94 Hawai'i at 496, 17 P.3d at 228. This court stated that:

This amendment does not affect any substantive rights created by the Workers' Compensation Law. It merely clarifies that an employer's right to subject its employee to a second medical examination by the employer's physician depends upon the presence of good and valid reasons for the examination that relate to changes in the employee's medical condition. In that sense, the amendment is remedial. The amendment is also procedural, inasmuch as medical examinations of an employee are merely an element of the mechanism by which the employee's right to workers' compensation is determined. In other words, such examinations merely relate to collateral matters of the enforcement and administration of these rights.
94 Hawai`i at 496, 17 P.3d at 228 (internal quotation marks and citation omitted).
[45] We observe, however, that, based upon the above holding, the trial court's COL No. 66 that the "appropriate date for determining when [the Kaho`ohanohanos'] substantive right to joint and several liability vested was the date of the filing of the complaint" was erroneous. Nonetheless, the trial court reached the correct ultimate conclusion of no retroactivity.
[1] Although the parties did not challenge Conclusion of Law (COL) no. 66 entered by the Circuit Court of the Second Circuit (the court), I respectfully note that the rights of Plaintiff-Appellee Jarrett Kaho`ohanohano (Jarrett) accrued at the time of the reported injury to the child (Minor) and not at the time of the filing of the complaint as stated in COL no. 66. See also majority opinion at ___ n. 45, 178 P.3d at 591-92 n. 45.

Act U2, signed into law on May 19, 2006, abolished joint and several liability as to government entities except for "tort claims relating to the maintenance and design of highways pursuant to section 663-10.9" 2006 Haw. Sess. L. Act 112  1, at 325. Act 112 also contained a retroactivity provision that allowed for retroactive application of the new rule "to the extent permitted by law." 2006 Haw. Sess. L. Act 112  3, at 326. In considering whether Act 112 could be applied lawfully in the instant case, the court correctly concluded that "[t]he legislature's Conference Committee report confirms" that Act 112 may be applied retroactively only to the extent that such application would not "violat[e] accrued or substantive rights." The court further concluded that "[t]he appropriate date for determining when [Jarrett's] substantive right to joint and several liability vested was the date of the filing of the complaint, and retroactive divestiture would be manifestly unjust." While this conclusion has no impact on the disposition of the instant case, inasmuch as Act 112 was not applied, I note the foregoing as Jarrett acknowledged in oral argument, because the question of the correct construction of Act 112 may arise in future cases.
[2] I note that the DHS's argument that "Jarrett's . . . distance from the injury demonstrates that any harm he suffered certainly appears remote from DHS's alleged role[]" is consistent with a recent majority decision of this court regarding NIED. See Liberty Mut. Fire Ins. Co. v. Dennison, 108 Hawai'i 380, 388, 120 P.3d 1115, 1123 (2005) (holding that a father who saw his injured son after a serious automobile accident was not entitled to damages for his emotional distress under his automobile insurance policy).
[3] Contrastingly, in this case, the majority holds that "Jarrett's psychological injuries were [not] too remote from DHS's conduct to permit recovery for NIED[]" because "to recover for NIED, Jarrett was required [only] to establish some predicate injury to . . . another person [and] his physical presence and witnessing of Minor's injury is not required." Majority opinion at ___, 178 P.3d at 584.
[4] As a matter of interest, I note that a related matter was discussed by this court in Guia v. Arakaki, No. 23890, 105 Hawai`i 484, 99 P.3d 1068, 2004 WL 2516287 at *4 (Haw. Nov.5, 2004) (unpublished disposition), in which the majority declined to create an exception to the physical injury rule for "near miss" automobile accidents. But see id. (Acoba, J., concurring and dissenting) (arguing that plaintiff should not, as a matter of law, be precluded from bringing NIED claim arising from negligent conduct that "place[d her] in personal peril although no physical contact occur[red]" because the proper test was whether "`a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case'" (quoting Rodrigues, 52 Haw. at 173, 472 P.2d at 520 (some brackets in original))).